# THORNHILL *v.* ALABAMA.

No. 514. Argued February 29, 1940.—Decided April 22, 1940.

90

*Messrs. James J. Mayfield* and *Joseph A. Padway* for petitioner.

*Mr. William H. Loeb,* Assistant Attorney General of Alabama, with whom *Mr. Thos. S. Lawson,* Attorney General, was on the brief, for respondent.

MR. JUSTICE MURPHY delivered the opinion of the Court.

Petitioner, Byron Thornhill, was convicted in the Circuit Court of Tuscaloosa County, Alabama, of the violation of § 3448 of the State Code of 1923.[1] The Code section reads as follows:

"Section 3448. Loitering or picketing forbidden.—Any person or persons, who, without a just cause or legal excuse therefor, go near to or loiter about the premises or place of business of any other person, firm, corporation, or association of people, engaged in a lawful business, for the purpose, or with the intent of influencing, or inducing other persons not to trade with, buy from, sell to, have business dealings with, or be employed by such persons, firm, corporation, or association, or who picket the works or place of business of such other persons, firms, corporations, or associations of persons, for the purpose of hindering, delaying, or interfering with or injuring any lawful business or enterprise of another, shall be guilty of a

---

[1] Petitioner was first charged and convicted in the Inferior Court of Tuscaloosa County and sentenced to imprisonment for fifty-nine days in default of payment of a fine of one hundred dollars and costs. Upon appeal to the Circuit Court, another complaint was filed and a trial *de novo* was had pursuant to the local practice. The Circuit Court sentenced petitioner, upon his conviction, to imprisonment for seventy-three days in default of payment of a fine of one hundred dollars and costs.

misdemeanor; but nothing herein shall prevent any person from soliciting trade or business for a competitive business."

The complaint against petitioner, which is set out in the margin,[2] is phrased substantially in the very words of the statute. The first and second counts charge that petitioner, without just cause or legal excuse, did "go near to or loiter about the premises" of the Brown Wood Preserving Company with the intent or purpose of influencing others to adopt one of enumerated courses of conduct. In the third count, the charge is that petitioner "did picket" the works of the Company "for the purpose of hindering, delaying or interfering with or injuring [its] lawful business." Petitioner demurred to the complaint on the grounds, among others, that § 3448 was repugnant to the Constitution of the United States in

---

[2] "1. The State of Alabama, by its Solicitor, complains of Byron Thornhill that, within twelve months before the commencement of this prosecution he did without just cause or legal excuse therefor, go near to or loiter about the premises or place of business of another person, firm, corporation, or association of people, to-wit: the Brown Wood Preserving Company, Inc., a corporation, engaged in a lawful business, for the purpose or with the intent of influencing or inducing other persons not to trade with, buy from, sell to, have business dealings with, or be employed by the said Brown Wood Preserving Company, Inc., a corporation, for the purpose of hindering, delaying, or interfering with or injuring the lawful business or enterprise of the said Brown Wood Preserving Company, Inc., a corporation.

"2. [The second count is identical with the first, except that the last clause, charging a purpose to hinder, delay, or interfere, etc., with the lawful business of the Preserving Company, is omitted.]

"3. The State of Alabama, by its Solicitor, complains of Byron Thornhill that, within twelve months before the commencement of this prosecution he did picket the works or place of business of another person, firm, corporation, or association of people, to-wit, the Brown Wood Preserving Company, Inc., a corporation, for the purpose of hindering, delaying, or interfering with or injuring the lawful business or enterprise of the said Brown Wood Preserving Company, Inc., a corporation."

that it deprived him of "the right of peaceful assemblage," "the right of freedom of speech," and "the right to petition for redress." The demurrer, so far as the record shows, was not ruled upon, and petitioner pleaded not guilty. The Circuit Court then proceeded to try the case without a jury, one not being asked for or demanded. At the close of the case for the State, petitioner moved to exclude all the testimony taken at the trial on the ground that § 3448 was violative of the Constitution of the United States.[3] The Circuit Court overruled the motion, found petitioner "guilty of Loitering and Picketing as charged in the complaint," and entered judgment accordingly. The judgment was affirmed by the Court of Appeals, which considered the constitutional question and sustained the section on the authority of two previous decisions in the Alabama courts.[4] *O'Rourke* v. *Birmingham*, 27 Ala. App. 133; 168 So. 206, cert. denied, 232 Ala. 355; 168 So. 209; *Hardie-Tynes Mfg. Co.* v. *Cruise*, 189 Ala. 66; 66 So. 657. A petition for certiorari was denied by the Supreme Court of the State. The case is here on certiorari granted because of the importance of the questions presented. 308 U. S. 547.

The proofs consist of the testimony of two witnesses for the prosecution.[5] It appears that petitioner on the morn-

---

[3] The petitioner also moved to exclude the testimony on the ground that it was insufficient to sustain a conviction. Upon being asked by the Court whether he insisted on this ground, however, counsel for petitioner stated that the only question he wanted to raise was the constitutionality of the statute.

[4] The Court of Appeals stated: "It seems clear enough that the evidence adduced upon the trial was sufficient to bring appellant's actions, for which he was being prosecuted, within the purview of the prohibition implied in said Statute.

"So, as conceded by able counsel here representing appellant, 'the only question involved in this appeal is the constitutionality *vel non* of Section 3448 of the Code of Alabama of 1923.'"

[5] No evidence was offered on behalf of petitioner.

ing of his arrest was seen "in company with six or eight other men" "on the picket line" at the plant of the Brown Wood Preserving Company. Some weeks previously a strike order had been issued by a Union, apparently affiliated with the American Federation of Labor, which had as members all but four of the approximately one hundred employees of the plant. Since that time a picket line with two picket posts of six to eight men each had been maintained around the plant twenty-four hours a day. The picket posts appear to have been on Company property, "on a private entrance for employees, and not on any public road." One witness explained that practically all of the employees live on Company property and get their mail from a post office on Company property and that the Union holds its meetings on Company property. No demand was ever made upon the men not to come on the property. There is no testimony indicating the nature of the dispute between the Union and the Preserving Company, or the course of events which led to the issuance of the strike order, or the nature of the efforts for conciliation.

The Company scheduled a day for the plant to resume operations. One of the witnesses, Clarence Simpson, who was not a member of the Union, on reporting to the plant on the day indicated, was approached by petitioner who told him that "they were on strike and did not want anybody to go up there to work." None of the other employees said anything to Simpson, who testified: "Neither Mr. Thornhill nor any other employee threatened me on the occasion testified to. Mr. Thornhill approached me in a peaceful manner, and did not put me in fear; he did not appear to be mad." "I then turned and went back to the house, and did not go to work." The other witness, J. M. Walden, testified: "At the time Mr. Thornhill and Clarence Simpson were talking to each other, there was no one else present, and I heard no harsh words and saw

nothing threatening in the manner of either man." [6]   For engaging in some or all of these activities, petitioner was arrested, charged, and convicted as described.

*First.* The freedom of speech and of the press, which are secured by the First Amendment against abridgment by the United States, are among the fundamental personal rights and liberties which are secured to all persons by the Fourteenth Amendment against abridgment by a State.[7]

The safeguarding of these rights to the ends that men may speak as they think on matters vital to them and that falsehoods may be exposed through the processes of education and discussion is essential to free government. Those who won our independence had confidence in the power of free and fearless reasoning and communication of ideas to discover and spread political and economic truth.   Noxious doctrines in those fields may be refuted and their evil averted by the courageous exercise of the right of free discussion.   Abridgment of freedom of speech and of the press, however, impairs those opportunities for public education that are essential to effective exercise of the power of correcting error through the processes of popular government.   Compare *United States* v. *Carolene Products Co.,* 304 U. S. 144, 152–153n.   Mere legislative preference for one rather than another means for combatting substantive evils, therefore, may well prove an inade-

---

[6] Simpson and Walden are not in entire accord with respect to the number of persons present during the conversation between Simpson and petitioner.   A possible inference from Simpson's testimony, considered by itself, is that petitioner was in the company of six or eight others when the conversation took place.   This difference is not material in our view of the case.

[7] *Schneider* v. *State,* 308 U. S. 147, 160; *Lovell* v. *Griffin,* 303 U. S. 444, 450; *De Jonge* v. *Oregon,* 299 U. S. 353; *Grosjean* v. *American Press Co.,* 297 U. S. 233, 244; *Near* v. *Minnesota,* 283 U. S. 697, 707; *Stromberg* v. *California,* 283 U. S. 359, 368; *Gitlow* v. *New York,* 268 U. S. 652, 666.   See *Palko* v. *Connecticut,* 302 U. S. 319, 326–327.

quate foundation on which to rest regulations which are aimed at or in their operation diminish the effective exercise of rights so necessary to the maintenance of democratic institutions. It is imperative that, when the effective exercise of these rights is claimed to be abridged, the courts should "weigh the circumstances" and "appraise the substantiality of the reasons advanced" in support of the challenged regulations. *Schneider* v. *State*, 308 U. S. 147, 161, 162.

*Second.* The section in question must be judged upon its face.

The finding against petitioner was a general one. It did not specify the testimony upon which it rested.[8] The charges were framed in the words of the statute and so must be given a like construction. The courts below expressed no intention of narrowing the construction put upon the statute by prior state decisions.[9] In these circumstance, there is no occasion to go behind the face of the statute or of the complaint for the purpose of determining whether the evidence, together with the permissible inferences to be drawn from it, could ever support a conviction founded upon different and more precise charges. "Conviction upon a charge not made would be sheer denial of due process." *De Jonge* v. *Oregon*, 299 U. S. 353, 362; *Stromberg* v. *California*, 283 U. S. 359, 367–368. The State urges that petitioner may not complain of the deprivation of any rights but his own. It would not follow that on this record petitioner could not complain of the sweeping regulations here challenged.

---

[8] The trial court merely found petitioner "guilty of Loitering and Picketing as charged in the complaint."

[9] The Court of Appeals determined merely that the evidence was sufficient to support the conviction under § 3448. See note 4, *supra.* It then sustained the judgment in reliance upon *O'Rourke* v. *Birmingham,* 27 Ala. App. 133; 168 So. 206, cert. denied, 232 Ala. 355; 168 So. 209; and *Hardie-Tynes Mfg. Co.* v. *Cruise,* 189 Ala. 66; 66 So. 657.

There is a further reason for testing the section on its face. Proof of an abuse of power in the particular case has never been deemed a requisite for attack on the constitutionality of a statute purporting to license the dissemination of ideas. *Schneider* v. *State,* 308 U. S. 147, 162–165; *Hague* v. *C. I. O.,* 307 U. S. 496, 516; *Lovell* v. *Griffin,* 303 U. S. 444, 451. The cases when interpreted in the light of their facts indicate that the rule is not based upon any assumption that application for the license would be refused or would result in the imposition of other unlawful regulations.[10] Rather it derives from an appreciation of the character of the evil inherent in a licensing system. The power of the licensor against which John Milton directed his assault by his "Appeal for the Liberty of Unlicensed Printing" is pernicious not merely by reason of the censure of particular comments but by reason of the threat to censure comments on matters of public concern. It is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion. See *Near* v. *Minnesota,* 283 U. S. 697, 713. One who might have had a license for the asking may therefore call into question the whole scheme of licensing when he is prosecuted for failure to procure it. *Lovell* v. *Griffin,* 303 U. S. 444; *Hague* v. *C. I. O.,* 307 U. S. 496. A like threat is inherent in a penal statute, like that in question here, which does not aim specifically at evils within the allowable area of state control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech or of the press. The existence of such a statute, which readily lends itself to harsh and discriminatory enforcement by local prose-

---

[10] Compare *Electric Bond Co.* v. *Comm'n,* 303 U. S. 419; *Smith* v. *Cahoon,* 283 U. S. 553, 562; *Gundling* v. *Chicago,* 177 U. S. 183, 186; *Lehon* v. *Atlanta,* 242 U. S. 53, 55, 56; *Hall* v. *Geiger-Jones Co.,* 242 U. S. 539, 553, 554.

cuting officials, against particular groups deemed to merit their displeasure, results in a continuous and pervasive restraint on all freedom of discussion that might reasonably be regarded as within its purview.[11] It is not any less effective or, if the restraint is not permissible, less pernicious than the restraint on freedom of discussion imposed by the threat of censorship.[12] An accused, after arrest and conviction under such a statute, does not have to sustain the burden of demonstrating that the State could not constitutionally have written a different and specific statute covering his activities as disclosed by the charge and the evidence introduced against him. *Schneider* v. *State,* 308 U. S. 147, 155, 162–163. Where regulations of the liberty of free discussion are concerned, there are special reasons for observing the rule that it is the statute, and not the accusation or the evidence under it, which prescribes the limits of permissible conduct and warns against transgression. *Stromberg* v. *California,* 283 U. S. 359, 368; *Schneider* v. *State,* 308 U. S. 147, 155, 162–163. Compare *Lanzetta* v. *New Jersey,* 306 U. S. 451.

*Third.* Section 3448 has been applied by the state courts so as to prohibit a single individual from walking slowly and peacefully back and forth on the public sidewalk in

---

[11] The record in the case at bar permits the inference that, while picketing had been carried on for several weeks, with six to eight men at each of two picket posts, § 3448 was not enforced against anyone other than petitioner, the Union President, and then only after his conversation with Simpson who thereupon returned home rather than report for work.

[12] A distinguished commentator has observed that "the liberty of the press might be rendered a mockery and a delusion, and the phrase itself a byword, if, while every man was at liberty to publish what he pleased, the public authorities might nevertheless punish him for harmless publications." 2 Cooley, Const. Lim., 8th ed., p. 885. See Madison's Report on the Virginia Resolutions, 4 Ell. Deb., 2d ed., 1876, p. 569; Address on the Conduct of the Maryland Convention of 1788, 2 *id.,* p. 552.

front of the premises of an employer, without speaking to anyone, carrying a sign or placard on a staff above his head stating only the fact that the employer did not employ union men affiliated with the American Federation of Labor; [13] the purpose of the described activity was concededly to advise customers and prospective customers of the relationship existing between the employer and its employees and thereby to induce such customers not to patronize the employer. *O'Rourke* v. *Birmingham*, 27 Ala. App. 133; 168 So. 206, cert. denied, 232 Ala. 355; 168 So. 209.[14] The statute as thus authoritatively construed and applied leaves room for no exceptions based upon either the number of persons engaged in the proscribed activity, the peaceful character of their demeanor, the nature of their dispute with an employer, or the restrained character and the accurateness of the terminology used in notifying the public of the facts of the dispute.

The numerous forms of conduct proscribed by § 3448 are subsumed under two offenses: the first embraces the activities of all who "without just cause or legal excuse" "go near to or loiter about the premises" of any person engaged in a lawful business for the purpose of influencing or inducing others to adopt any of certain enumerated courses of action; the second, all who "picket" the place of business of any such person "for the purpose of hindering, delaying or interfering with or injuring any lawful business or enterprise of another." [15] It is apparent

---

[13] The employer in fact had locked out its union stagehands and was working others not regularly employed as stagehands in admitted violation of the National Industrial Recovery Act.

[14] Accused there asserted that the application of § 3448 to the particular facts of his case deprived him of rights guaranteed to him by the Fourteenth Amendment. The Court of Appeals passed upon this constitutional question and decided it adversely to the contentions of accused.

[15] There is a proviso that "nothing herein shall prevent any person from soliciting trade or business for a competitive business."

100

that one or the other of the offenses comprehends every practicable method whereby the facts of a labor dispute may be publicized in the vicinity of the place of business of an employer. The phrase "without just cause or legal excuse" does not in any effective manner restrict the breadth of the regulation; the words themselves have no ascertainable meaning either inherent or historical. Compare *Lanzetta* v. *New Jersey,* 306 U. S. 451, 453–455.[16] The courses of action, listed under the first offense, which an accused—including an employee—may not urge others to take, comprehends those which in many instances would normally result from merely publicizing, without annoyance or threat of any kind, the facts of a labor dispute. An intention to hinder, delay or interfere with a lawful business, which is an element of the second offense, likewise can be proved merely by showing that others reacted in a way normally expectable of some upon learning the facts of a dispute.[17] The vague contours of the

[16] So far as the phrase may have been given meaning by the state courts it apparently grants authority to the court and the jury to consider defensive matter brought forward by the accused, depending for its sufficiency not upon rules of general application but upon the peculiar facts of each case. See *Owens* v. *State,* 74 Ala. 401; *Bailey* v. *State,* 161 Ala. 75; 49 So. 886; *Folmar* v. *State,* 19 Ala. App. 435; 97 So. 768. Compare *O'Rourke* v. *Birmingham,* 27 Ala. App. 133; 168 So. 206, cert. denied, 232 Ala. 355; 168 So. 209.

[17] The only direct evidence in the case at bar to show that the activity of petitioner was accompanied by the necessary intent or purpose is the fact that one other employee, after talking with petitioner, refrained from reporting for work as planned. There is evidence here that the other employee was acquainted with the facts prior to his conversation with petitioner. The State concedes, however, that under § 3448 everyone must be deemed to intend the natural and probable consequences of his acts. See *Jacobs* v. *State,* 17 Ala. App. 396; 85 So. 837; *Reed* v. *State,* 18 Ala. App. 371; 92 So. 513; *Weeks* v. *State,* 24 Ala. App. 198; 132 So. 870, cert. denied, 222 Ala. 442; 132 So. 871; *Worrell* v. *State,* 24 Ala. App. 313; 136 So. 737, cert. denied, 223 Ala. 425; 136 So. 738.

term "picket" are nowhere delineated.[18] Employees or others, accordingly, may be found to be within the purview of the term and convicted for engaging in activities identical with those proscribed by the first offense. In sum, whatever the means used to publicize the facts of a labor dispute, whether by printed sign, by pamphlet, by word of mouth or otherwise, all such activity without exception is within the inclusive prohibition of the statute so long as it occurs in the vicinity of the scene of the dispute.

*Fourth.* We think that § 3448 is invalid on its face.

The freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent

---

[18] See Hellerstein, *Picketing Legislation and the Courts* (1931), 10 No. Car. L. Rev. 158, 186n.: "A picketer may: (1) Merely observe workers or customers. (2) Communicate information, e. g., that a strike is in progress, making either true, untrue or libelous statements. (3) Persuade employees or customers not to engage in relations with the employer: (a) through the use of banners, without speaking, carrying true, untrue or libelous legends; (b) by speaking, (i) in a calm, dispassionate manner, (ii) in a heated, hostile manner, (iii) using abusive epithets and profanity, (iv) yelling loudly, (v) by persisting in making arguments when employees or customers refuse to listen; (c) by offering money or similar inducements to strike breakers. (4) Threaten employees or customers: (a) by the mere presence of the picketer; the presence may be a threat of, (i) physical violence, (ii) social ostracism, being branded in the community as a "scab," (iii) a trade or employees' boycott, i. e., preventing workers from securing employment and refusing to trade with customers, (iv) threatening injury to property; (b) by verbal threats. (5) Assaults and use of violence. (6) Destruction of property. (7) Blocking of entrances and interference with traffic.

"The picketer may engage in a combination of any of the types of conduct enumerated above. The picketing may be carried on singly or in groups; it may be directed to employees alone or to customers alone or to both. It may involve persons who have contracts with the employer or those who have not or both."

punishment.[19]  The exigencies of the colonial period and the efforts to secure freedom from oppressive administration developed a broadened conception of these liberties as adequate to supply the public need for information and education with respect to the significant issues of the times.[20]  The Continental Congress in its letter sent to the Inhabitants of Quebec (October 26, 1774) referred to the "five great rights" and said: "The last right we shall mention, regards the freedom of the press.  The importance of this consists, besides the advancement of truth, science, morality, and arts in general, in its diffusion of liberal sentiments on the administration of Government, its ready communication of thoughts between subjects, and its consequential promotion of union among them, whereby oppressive officers are ashamed or intimidated, into more honourable and just modes of conducting affairs."  Journal of the Continental Congress, 1904 ed., vol. I, pp. 104, 108.  Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period.

In the circumstances of our times the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution.  *Hague* v. *C. I. O.*, 307 U. S. 496; *Schneider* v. *State*, 308 U. S. 147, 155, 162–63.  See *Senn* v. *Tile Layers Union*, 301 U. S. 468,

---

[19] *Stromberg* v. *California*, 283 U. S. 359; *Near* v. *Minnesota*, 283 U. S. 697; *Lovell* v. *Griffin*, 303 U. S. 444; *Hague* v. *C. I. O.*, 307 U. S. 496; *Schneider* v. *State*, 308 U. S. 147.

[20] See Duniway, *The Development of Freedom of the Press in Massachusetts*, p. 123 *et seq.;* Tyler, *Literary History of the American Revolution, passim;* 2 Bancroft, *History of the United States*, p. 261; Schofield, *Freedom of the Press in the United States* (1914), 9 Proc. Am. Sociol. Soc. 67, 76, 80.

478. It is recognized now that satisfactory hours and wages and working conditions in industry and a bargaining position which makes these possible have an importance which is not less than the interests of those in the business or industry directly concerned. The health of the present generation and of those as yet unborn may depend on these matters, and the practices in a single factory may have economic repercussions upon a whole region and affect widespread systems of marketing. The merest glance at state and federal legislation on the subject demonstrates the force of the argument that labor relations are not matters of mere local or private concern. Free discussion concerning the conditions in industry and the causes of labor disputes appears to us indispensable to the effective and intelligent use of the processes of popular government to shape the destiny of modern industrial society. The issues raised by regulations, such as are challenged here, infringing upon the right of employees effectively to inform the public of the facts of a labor dispute are part of this larger problem. We concur in the observation of Mr. Justice Brandeis, speaking for the Court in *Senn's* case (301 U. S. at 478): "Members of a union might, without special statutory authorization by a State, make known the facts of a labor dispute, for freedom of speech is guaranteed by the Federal Constitution."

It is true that the rights of employers and employees to conduct their economic affairs and to compete with others for a share in the products of industry are subject to modification or qualification in the interests of the society in which they exist.[21] This is but an instance

[21] See, e. g., *Senn* v. *Tile Layers Union*, 301 U. S. 468; *Ethyl Gasoline Corp.* v. *United States*, 309 U. S. 436; *National Labor Relations Board* v. *Newport News Co.*, 308 U. S. 241; *West Coast Hotel Co.* v. *Parrish*, 300 U. S. 379; *Nebbia* v. *New York*, 291 U. S. 502; *Dorchy* v.

of the power of the State to set the limits of permissible contest open to industrial combatants. See Mr. Justice Brandeis in 254 U. S. at 488. It does not follow that the State in dealing with the evils arising from industrial disputes may impair the effective exercise of the right to discuss freely industrial relations which are matters of public concern. A contrary conclusion could be used to support abridgment of freedom of speech and of the press concerning almost every matter of importance to society.

The range of activities proscribed by § 3448, whether characterized as picketing or loitering or otherwise, embraces nearly every practicable, effective means whereby those interested—including the employees directly affected—may enlighten the public on the nature and causes of a labor dispute. The safeguarding of these means is essential to the securing of an informed and educated public opinion with respect to a matter which is of public concern. It may be that effective exercise of the means of advancing public knowledge may persuade some of those reached to refrain from entering into advantageous relations with the business establishment which is the scene of the dispute. Every expression of opinion on matters that are important has the potentiality of inducing action in the interests of one rather than another group in society. But the group in power at any moment may not impose penal sanctions on peaceful and truthful discussion of matters of public interest merely on a showing that others may thereby be persuaded to take action inconsistent with its interests. Abridgment of the liberty of such discussion can be justified only where the

Kansas, 272 U. S. 306; Eastern States Retail Lumber Dealers Assn. v. United States, 234 U. S. 600; Aikens v. Wisconsin, 195 U. S. 194; Holden v Hardy, 169 U. S. 366.

clear danger of substantive evils arises under circumstances affording no opportunity to test the merits of ideas by competition for acceptance in the market of public opinion.[22] We hold that the danger of injury to an industrial concern is neither so serious nor so imminent as to justify the sweeping proscription of freedom of discussion embodied in § 3448.

The State urges that the purpose of the challenged statute is the protection of the community from the violence and breaches of the peace, which, it asserts, are the concomitants of picketing. The power and the duty of the State to take adequate steps to preserve the peace and to protect the privacy, the lives, and the property of its residents cannot be doubted. But no clear and present danger of destruction of life or property, or invasion of the right of privacy, or breach of the peace can be thought to be inherent in the activities of every person who approaches the premises of an employer and publicizes the facts of a labor dispute involving the latter. We are not now concerned with picketing *en masse* or otherwise conducted which might occasion such imminent and aggravated danger to these interests as to justify a statute narrowly drawn to cover the precise situation giving rise to the danger. Compare *American Foundries* v. *Tri-City Council*, 257 U. S. 184, 205. Section 3448 in question here does not aim specifically at serious encroachments on these interests and does not evidence any such care in balancing these interests against the interest of the community and that of the individual in freedom of discussion on matters of public concern.

It is not enough to say that § 3448 is limited or restricted in its application to such activity as takes place at the scene of the labor dispute. "[The] streets are

---

[22] See Mr. Justice Holmes in 249 U. S. at 52; 250 U. S. at 630.

natural and proper places for the dissemination of information and opinion; and one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider* v. *State,* 308 U. S. 147, 161, 163; *Hague* v. *C. I. O.,* 307 U. S. 496, 515–16.[23]  The danger of breach of the peace or serious invasion of rights of property or privacy at the scene of a labor dispute is not sufficiently imminent in all cases to warrant the legislature in determining that such place is not appropriate for the range of activities outlawed by § 3448.

*Reversed.*

MR. JUSTICE MCREYNOLDS is of opinion that the judgment below should be affirmed.

---

[23] The fact that the activities for which petitioner was arrested and convicted took place on the private property of the Preserving Company is without significance.  Petitioner and the other employees were never treated as trespassers, assuming that they could be where the Company owns such a substantial part of the town.  See p. 94, *supra.*  And § 3448, in any event, must be tested upon its face.