The 41 named complainants, owners of land in the Borough of Mount Ephraim, in the County of Camden, New Jersey, filed a class bill. They pray the enforcement, by a decree of this court, of the following restrictive covenant:
"(f) No race or nationality other than the white or Caucasian race shall use or occupy any building on any lot, except that this restriction shall not prevent occupancy by domestic servants of a different race or nationality employed by an owner or tenant."
Prior to the year 1939 the Borough of Mount Ephraim, a municipal corporation in Camden County, New Jersey, had adopted a plan for the sale of lands taken over by it after foreclosure of tax sale certificate, providing that if a purchaser would, within a limited period of time, erect a dwelling thereupon, such lands would be sold and conveyed by the municipality for a nominal consideration. Difficulty was encountered when efforts were made to meet the cost of improvements through mortgage loans. There were, at that time, three Negro families who owned and occupied homes in a residential section of the municipality known as Northmont. They had been in occupancy of these properties for many years. The Federal Housing Administration agreed to make mortgaged loans upon lands sold by the municipality provided certain restrictive covenants were inserted in deeds of conveyance. Such covenants, 12 in number, were prepared, approved and, generally speaking, thereafter inserted in all conveyances by the municipality.
January 10th, 1944, the defendant municipality conveyed a lot of land at the southwest corner of Black Horse Pike and Sixth Avenue in Northmont, for a consideration of $1,190. The purchasers were John C. Jones, a practicing physician, and Lillian H. Jones, his wife. In the deed of conveyance to them many of the twelve restrictive covenants were inserted but that designated as "f" (the only covenant with which we are now concerned) was not included. Dr. and Mrs. Jones proceeded to erect a dwelling and professional offices upon their land at a cost exceeding $15,000. The dwelling adjoins the dwellings owned and occupied by the other Negro families. Since completion of the building they have occupied the dwelling *Page 217 
and Dr. Jones has practiced from the offices contained therein. The complainants ask that this court by its decree enforce restrictive covenant "f." Complainants charge (and the fact is frankly admitted) that Dr. and Mrs. Jones "are not of the white or Caucasian race, but are Negroes." Thus it is revealed that the question to be determined by this court is whether a judicial enforcement of the restrictive covenant in this case by this, a state court, would constitute a denial to the defendants of their constitutional right to equal protection of the law.
On a broad constitutional issue, involving a question of national rather than local scope (as does the question before me), the New Jersey Court of Errors and Appeals has clearly and definitely indicated that the courts of this State must conform their decisions with those of the United States Supreme Court. This court was reversed in Heine's, Inc., v. Truck Drivers',c., Local, 129 N.J. Eq. 308; 19 Atl. Rep. 2d 204, to effectuate conformity of the determination with decisions of the United States Supreme Court, some of which had not been formulated or published when the Chancellor, on the advice of a Vice-Chancellor, entered his decree. The case involved disputes growing out of differences between an employer, Heine's, Inc., and certain of its employees represented by Truck Drivers', c., Local. Mr. Chief-Justice Brogan, speaking for our state court of last resort, said: "One further point was made by the defendants. Relying on Thornhill v. Alabama, 310 U.S. 88, and Carlson
v. California, 310 U.S. 106, they contended that their activities, unaccompanied by violence, were an exercise of their right of freedom of speech and of the press guaranteed to the individual by our federal constitution and secured to him against invasion by state statute by the Fourteenth Amendment thereto. As to this the Vice-Chancellor held these cases were not controlling for the reason that both were concerned with `penal legislation,' in the former case a statute of the State of Alabama, and in the latter an ordinance of Shasta County, California, which prohibited picketing generally. But assuredly the federalSupreme Court passed upon the principle which is the underlyingquestion here. * * * Of equal importance in *Page 218 
the exposition of the controlling legal philosophy on these fundamental questions are the more recent decisions of our United States Supreme Court in [citations], which had not been decidedwhen the Vice-Chancellor considered the instant case." (Italics supplied.) See, also, Lora Lee Dress Co., Inc., v.International, c., Local, c., 129 N.J. Eq. 368 (at p. 370);19 Atl. Rep. 2d 659, where the same court, again reversing the Chancery Court, repeated the quoted language.
The United States Supreme Court recently decided four cases which had been argued before it at the October term, 1947, to wit: Shelley v. Kraemer (Case No. 72); McGhee v. Sipes
(Case No. 87); Hurd v. Hodge (Case No. 290), andUrciolo v. Hodge (Case No. 291). The opinions of the court in those cases were delivered by Mr. Chief-Justice Vinson on May 3d 1948. In all four cases the question submitted was the "validity of court enforcement of private agreements, generally described as restrictive covenants, which have as their purpose the exclusion of persons of designated race or color from the ownership or occupancy of real property." In his opinion deciding the first two named cases (Shelley v. Kraemer and McGhee v.Sipes), the Chief-Justice said: "It should be observed that these covenants do not seek to proscribe any particular use of the affected properties. Use of the properties for residential occupancy, as such, is not forbidden. The restrictions of these agreements, rather, are directed toward a designated class of persons and seek to determine who may and who may not own or make use of the properties for residential purposes. The excluded class is defined wholly in terms of race or color; `simply that and nothing more.'
"It cannot be doubted that among the civil rights intended to be protected from discriminatory state action by the Fourteenth Amendment are the rights to acquire, enjoy, own and dispose of property. Equality in the enjoyment of property rights was regarded by the framers of that amendment as an essential pre-condition to the realization of other basic civil rights and liberties which the amendment was intended to guarantee." After pointing out a distinction between a restriction imposed by ordinance or state statute, and a restriction *Page 219 
imposed in an agreement amongst private persons, the court continued: "We conclude, therefore, that the restrictive agreements standing alone cannot be regarded as a violation of any rights guaranteed to petitioners by the Fourteenth Amendment. So long as the purposes of those agreements are effectuated by voluntary adherence to their terms, it would appear clear that there has been no action by the State and the provisions of the amendment have not been violated. Cf. Corrigan v. Buckley,supra [271 U.S. 323 (1926)]."
Chief-Justice Vinson continued: "But here there was more. These are cases in which the purposes of the agreements were secured only by judicial enforcement by state courts of the restrictive terms of the agreements * * *.
"That the action of state courts and of judicial officers in their official capacities is to be regarded as action of the state within the meaning of the Fourteenth Amendment, is a proposition which has long been established by decisions of this court * * *.
"The short of the matter is that from the time of the adoption of the Fourteenth Amendment until the present, it has been the consistent ruling of this court that the action of the states to which the amendment has reference, includes action of state courts and state judicial officials. Although, in construing the terms of the Fourteenth Amendment, differences have from time to time been expressed as to whether particular types of state action may be said to offend the amendment's prohibitory provisions, it has never been suggested that state court action is immunized from the operation of those provisions simply because the act is that of the judicial branch of the state government.
"* * * Nor is the amendment ineffective simply because the particular pattern of discrimination, which the state has enforced, was defined initially by the terms of a private agreement. State action, as that phrase is understood for the purposes of the Fourteenth Amendment, refers to exertions of state power in all forms. And when the effect of that action is to deny rights subject to the protection of the Fourteenth Amendment, it is the obligation of this court to enforce the constitutional commands. *Page 220 
"We hold that in granting judicial enforcement of the restrictive agreements in these cases, the states have denied petitioners the equal protection of the laws and that, therefore, the action of the state courts cannot stand." To like effect is the decision in the latter two cases above named (Hurd v.Hodge and Urciolo v. Hodge).
I feel impelled by the decisions cited to advise the dismissal of the bill of complaint.