UNITED STATES v. CONGRESS OF INDUSTRIAL ORGANIZATIONS et al.

Criminal No. 167—48.

District Court, of the United States for the District of Columbia.

March 15, 1948.

Order Affirmed June 21, 1948.

See 68 S.Ct. 1349.

Turner Smith and Jesse Climenko, Sp. Assts. to Atty. Gen., both of Washington, D. C., for plaintiff.

Charles J. Margiotti, of Pittsburgh, Pa., Lee Pressman, of New York City, and Frank Donner, of Washington, D. C., for defendants.

BEN MOORE, District Judge.

The Labor Management Relations Act, 29 U.S.C.A. § 141 et seq., recently passed by Congress, imposes many conditions, restrictions, limitations and prohibitions upon labor organizations in the economic arena wherein the battles between labor and management are fought. With these economic features of the Act we are not concerned in this case. However, by one section of the Act Congress broadened its scope to include activities of labor organizations in the political field.

Section 304, 2 U.S.C.A. § 251, makes it unlawful for any labor organization to make an expenditure in connection with any election at which candidates for a federal office are to be selected or voted for. The penal sanctions of this section extend also to an officer of a labor organization who consents to such an expenditure by the organization of which he is an officer.

This case arises under Section 304 of the Act.

The Congress of Industrial Organizations, conveniently referred to as CIO, publishes and circulates a newspaper called the CIO News. Philip Murray is president of CIO.

On July 15, 1947, a special election was held to elect a representative in Congress in the Third Congressional District of the State of Maryland. Immediately prior to this election, in express disobedience of the provisions of Section 304 of the Labor Management Relations Act relative to expenditures by labor organizations in connection with federal elections, and for the purpose of testing their constitutionality, Murray wrote an editorial favoring one of the candidates and opposing the other, and caused it to be published in the CIO News, and circulated in the Third Congressional District of Maryland. Apparently to remove all doubt that CIO was by this act making expenditures in connection with an election, one thousand extra copies of the newspaper containing Murray's editorial were printed and circulated by CIO. The expenditures for publishing and circulating the newspaper were made in the District of Columbia, and the one thousand extra copies were mailed from there to be circulated in Maryland.

This indictment followed. It charges CIO with making expenditures in connection with a federal election by publishing and circulating the Murray editorial, and Murray as president of CIO with consenting to such expenditures.

Defendants have moved to dismiss the indictment on the broad ground that the applicable part of Section 304 of the Act is unconstitutional because it violates the guaranties of the Bill of Rights, particularly those of the First Amendment.

The government concedes that rights guaranteed by the First Amendment are abridged by the prohibition against expenditures by labor organizations in connection with elections; but it says that Congress has power under Article 1, Section 4, of the Constitution to abridge First Amendment rights if it considers such a course necessary in maintaining the purity and freedom of elections.

Thus the Court is confronted with the necessity of passing on the validity of Section 304 of the Act, insofar as it relates to expenditures by labor organizations in connection with federal elections.

I am sensible of the deference which courts must accord to the considered will of the legislative branch of the government as expressed in a statute. If a reasonable construction of the statute can logically be made under which it is free from imputation of unconstitutionality, the statute must be so interpreted. If, however, the words of the statute are plain and can have only one meaning, a court cannot escape the obligation of deciding whether or not it falls within the limits of constitutional legislative power. Gemsco, Inc., et al. v. Walling, 324 U.S. 244, 260, 65 S.Ct. 605, 89 L.Ed. 921; United States v. Rice, District Judge, 327 U.S. 742, 753, 66 S.Ct. 835, 90 L.Ed. 982. By

the words of this statute expenditures of a labor organization in connection with any federal election are made unlawful.[1] Regardless of whether this provision does or does not fix an ascertainable standard of guilt, it is clear that the acts of CIO in publishing and circulating the editorial, and of Murray in consenting thereto, come within its scope. The editorial was written with specific reference to a particular federal election and the expenditure made for publishing and circulating it was therefore necessarily made in connection with that election. The statute contains no exemption or exclusion eliminating from its prohibitions those activities which the Bill of Rights protects. Indeed, few acts in connection with an election, other than those which have for their purpose some sort of coercion, intimidation or corruption of the electorate could be said to be without the boundaries of such protection. It is plain that Congress by this statutory provision denounced as unlawful acts which would otherwise be entirely innocent in nature, and in the exercise of which a labor organization is concededly protected under the Bill of Rights. Cf. Grosjean v. American Press Co., Inc., et al., 297 U. S. 233, 56 S.Ct. 444, 80 L.Ed. 660; Bridges v. California, 314 U.S. 252, 62 S. Ct. 190, 86 L.Ed. 192, 159 A.L.R. 1346. I conclude, therefore, that the indictment charges an offense under Section 304 of the Labor Management Relations Act, and it follows that if the provisions of that section, pursuant to which the indictment was returned, were constitutionally valid, the indictment would necessarily be sustained.

Judged by its plain terms, the statute on its face fails to survive the constitutional test.

I am of opinion that the questioned portion of Section 304 of the Act is an unconstitutional abridgment of freedom of speech, freedom of the press and freedom of assembly. At no time are these rights so vital as when they are exercised during, preceding or following an election. If they were permitted only at times when they could have no effect in influencing public opinion, and denied at the very time and in relation to the very matters that are calculated to give the rights value, they would lose that precious character with which they have been clothed from the beginning of our national life. Cf. Bridges v. California, supra, 314 U.S. 269, 62 S.Ct. 190, 86 L.Ed. 192, 159 A.L.R. 1346.

The legislative history of the statutory provision under consideration, copiously related in briefs of counsel for the government, clearly shows that the legislation was aimed at the very type of political activity which is charged as an offense in this indictment, namely, the publication and distribution of newspapers containing editorials favoring or opposing candidates for federal office. It is insisted by the government that Congress could abridge the freedoms guaranteed by the First Amendment (which the government concedes was done here) because of its constitutional control over the manner of holding elections, and its consequent power to prevent corruption therein, and to secure clean elections. This argument would be persuasive if the statute prohibited specific acts of a kind which might conceivably be expected to produce corruption in any of its forms, or to prevent in any way the holding of free elections; but the untrammeled right of free expression of views as to candidates for office, through newspapers or other means of conveying the written or spoken word, and of the public in general to have free access thereto, far from being a conceivable means of

[1] "It is unlawful for * * * any labor organization to make a contribution or expenditure in connection with any election at which Presidential and Vice Presidential electors or a Senator or Representative in * * * Congress are to be voted for, or in connection with any primary election or political convention or caucus held to select candidates for any of the foregoing offices * * *. Every * * * labor organization which makes any contribution or expenditure in violation of this section shall be fined * * *; and every officer * * * of any labor organization, who consents to any contribution or expenditure by the * * * labor organization * * * shall be fined * * *." The section further provides penalties for its violation. 2 U.S.C.A. § 251.

corrupting or interfering with free elections, is in fact one of the most valuable means of promoting purity and freedom in the electoral process. See De Jonge v. Oregon, 299 U.S. 353, 365, 57 S.Ct. 255, 81 L.Ed. 278.

It must be remembered that it is not only the right of the publisher of a newspaper or editorial sheet which is protected by the First Amendment; but also, and perhaps over and above that right, there is the right of the people to be informed of the views represented by conflicting interests and opinions. How are they to get such information concerning the views of laboring men and women if the organization in and through which such persons are united in a common purpose is forbidden to publish any views whatsoever?

It is contended that the evil sought to be remedied by this legislation consists in the use of money, paid into the treasury of a labor organization in the form of dues, for the purpose of publishing opinions and arguments which may not be in accord with the views of a minority of the organization. Such use of money, says the government, is fraught with implications of oppression and coercion of minorities of such import that Congress could act to prevent it, even to the extent of abridging the basic freedoms. It is doubtful whether such a contention would avail, even though the statute had been framed to cover only such cases. Inherent in the idea of collective activity is the principle that it shall be exercised on behalf of the organization pursuant to the will of the majority of its membership. This principle is recognized in the very statute of which the Labor Management Relations Act containing this Section 304 is an amendment. Labor Management Relations Act, 1947, 29 U.S.C.A. §§ 151, 159. However, the provision prohibiting expenditures by labor organizations in connection with elections does not purport to affect only cases in which a minority of the membership, however small or great, is opposed to the expenditure. It covers all such expenditures in connection with federal elections. We cannot presume that substantial differences of opinion or desire exist in labor organizations with reference to matters concerning labor's welfare.

Such organizations do not follow political party lines as such, and to say that doubtless there are in the membership large numbers of voters of differing political party affiliation is not to say that all these may not be unitedly in favor of or opposed to candidates who respectively favor or oppose the type of legislation which laboring men and women in general believe to be in their best interest.

■ From what has been said it is plain that no clear and present danger to the public interest can be found in the circumstances surrounding the enactment of this legislation. The Supreme Court has said, and reiterated in many cases, that such a situation must exist if any abridgment of the freedoms of the First Amendment is to be justified. Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093; West Virginia State Board of Education et al. v. Barnette et al., 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628, 147 A. L.R. 674; Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 322, 89 L.Ed. 430. Nowhere is the idea better expressed than in the Thomas case, wherein Mr. Justice Rutledge, speaking for the majority of the Court, says:

"The case confronts us again with the duty our system places on this Court to say where the individual's freedom ends and the State's power begins. Choice on that border, now as always delicate, is perhaps more so where the usual presumption supporting legislation is balanced by the preferred place given in our scheme to the great, the indispensable democratic freedoms secured by the First Amendment. * * * That priority gives these liberties a sanctity and a sanction not permitting dubious intrusions. And it is the character of the right, not of the limitation, which determines what standard governs the choice. * * *

"For these reasons any attempt to restrict those liberties must be justified by clear public interest, threatened not doubtfully or remotely, but by clear and present danger. The rational connection between the remedy provided and the evil to be curbed, which in other contexts might support legislation against attack on due process grounds, will not suffice. These rights

rest on firmer foundation. Accordingly, whatever occasion would restrain orderly discussion and persuasion, at appropriate time and place, must have clear support in public danger, actual or impending. Only the gravest abuses, endangering paramount interests, give occasion for permissible limitation."

Further on in the same opinion Mr. Justice Rutledge continues:

"Where the line shall be placed in a particular application rests * * * on the concrete clash of particular interests and the community's relative evaluation both of them and of how the one will be affected by the specific restriction, the other by its absence. That judgment in the first instance is for the legislative body. But in our system where the line can constitutionally be placed presents a question this Court cannot escape answering independently, whatever the legislative judgment, in the light of our constitutional tradition. * * * And the answer, under that tradition, can be affirmative, to support an intrusion upon this domain, only if grave and impending public danger requires this."

In support of its argument that congressional control over elections may be exercised in abridgment of rights protected by the First Amendment, the government points to the case of United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556. As I read that case the decision turned, not on the power of Congress to regulate elections, but on the right of the government to prescribe rules concerning the conduct of its own employees. Cf. United States v. Wurzbach, 280 U.S. 396, 398, 50 S.Ct. 167, 74 L.Ed. 508. The activities in which Mitchell had engaged and which resulted in his dismissal were, accepting office as a committeeman of a political party, and acting as paymaster for party workers. Such conduct can hardly be said to be comparable to the printing and circulating of editorial opinions by a person or group of persons not connected with either the government or a political party. I am unable to perceive that the views expressed herein are in any way at variance with the holding in the Mitchell case. Moreover, the Mitchell case and all

the other cases cited by the government dealing with congressional authority over elections extend only to the regulation of political activities. In no other statute except the one we are considering here have I found that Congress has prohibited absolutely all activities of any person or group at elections. The prohibition in this statute against expenditures by labor organizations in effect would prevent such organizations from doing any act in connection with an election, since they are composite entities and not individuals, and by their very nature can make no move which does not involve some expenditure.

Defendants contend that the legislation is vulnerable · also as an arbitrary discrimination against labor organizations in violation of the Fifth Amendment, and because it does not fix an ascertainable standard of guilt, as required by the Fifth and Sixth Amendments. I do not deem it essential to decide these questions, since I have concluded that the challenged provision of the statute is invalid because of abridgment of rights guaranteed by the First Amendment.

For the reasons given, the motion of defendants to dismiss the indictment will be sustained. An appropriate order may be presented for entry.