64 So.2d 393

### KLIBANOFF et al. v. TRI–CITIES RETAIL CLERKS' UNION, LOCAL NO. 1678 et al.

8 Div. 690.

Supreme Court of Alabama.
March 13, 1953.

480

Kenneth Perrine, Leader, Tenebaum, Perrine & Swedlaw, Birmingham, and Mitchell & Poellnitz, Florence, for appellants.

Harry J. Huddleston and Joel M. Love (of Huddleston & Love), Sheffield, for appellees.

PER CURIAM.

This is an appeal authorized by section 1057, Title 7, Code, from an order refusing a temporary injunction after a hearing as provided in section 1055, Title 7, Code. The bill of complaint was filed November 28, 1952.

The temporary injunction sought was to enjoin and restrain the respondents, their agents, servants and employees, from coercing, picketing or threatening to coerce or picket customers of complainants or from establishing or maintaining or .continuing to maintain a picket line at complainants' place of business, and to order an immediate removal of the picket line now in existence at or near complainants' place of business, and to cease and desist further picketing pending a final hearing; and from exercising coercion, intimidation or the use of force or threats of force against complainants.

The complainants are the partners owning and operating The Bootery, a retail women's shoe and apparel store in Florence, Alabama. It is alleged in the bill that complainants have eighteen employees there engaged in their service: that their business does not affect interstate commerce, so as to be subject to the jurisdiction of the National Labor Relations Board. The respondents are Tri-Cities Retail Clerks' Union, an unincorporated union affiliated with American Federation of Labor, but has not complied with section 382, Title 26, Code, pocket part; also named as respondents are Robert C. Poag, Miss Nadine Goad and Mrs. Fay Sizemore.

The bill alleges that the respondent union, in March 1952, notified complainants that it represented a majority of the employees of complainants in said business, and demanded that complainants enter into a contract with the union, "containing recognition of said union as sole bargaining representative for all of said employees and a closed shop agreement". To that complainants replied that they would discuss the matter with them at some agreeable time. The time and place were agreed upon, the time being March. 11, 1952. That prior thereto, on March 8, 1952, a telegram was received by the manager of complainants' business, signed by Maynard Baird, American Federation of Labor, advising that it was useless and unnecessary to meet; but that a committee of employees and Robert C. Poag are willing to meet and discuss union recognition. It requested a date to confer with reference to

that matter. Attorneys for complainants, on said March 8, 1952, in response advised said Baird that complainants state that his assertion is the only indication they have that the union represents a majority of their employees and desire representation; and they question his claim that the union represents a majority of the employees, and, therefore, they do not recognize the union for the purpose of negotiating a contract. They then suggested a willingness to abide by any legal procedure available and to meet any committee representing the employees for the purpose of facilitating and ironing out technicalities pertaining thereto. The evidence shows that respondent Poag had knowledge of those communications.

The bill alleges that there was no further communication between them until March 22, 1952, when Poag and another union official came into complainants' store and demanded to see one of the complainants. Klibanoff was not there at the time, but was at another store, and when so advised the union men asked that he be requested by telephone to come and confer with them, to which Klibanoff replied that he could not come at that time. Thereupon the union officials called a strike at The Bootery, which was on Saturday. Seven of the eighteen employees left on the strike call.

The evidence showed that complainants wrote a letter to all the employees stating that the store would open as usual on Monday, and unless they appeared they would be replaced. One of the seven returned to her job on Monday together with the eleven others who did not leave on the preceding Saturday. A picket line was started on said Saturday, March 22, 1952, participated in by all the striking employees, with Poag carrying a placard stating: *"This store unfair to Retail Clerks' Local Union No. 1678 A. F. of L."* Later four of the said six strikers secured work elsewhere and are not now involved. Two of the respondents Miss Goad and Mrs. Sizemore have continued the picketing to the time of filing the bill, being paid to do so by the union.

There are allegations of unlawful coercion, intimidation of employees and cus-

tomers and threats of personal injury. But the evidence is not of such character as to support an injunction on that ground, and will not be regarded as controlling.

After the picketing began on March 22, 1952, nothing else occurred worthy of note, except the picketing which continued, until during May 1952. The bill alleges that at the suggestion of certain union officials, affiliated with respondent union, complainants agreed to have a secret written vote of the employees, including those on strike (two in number), by a disinterested person to determine whether or not a majority of such employees desired to·become members of respondent union, and to be governed by the result of such secret written vote as to whether or not a contract should be entered into by and between complainants and respondent union. The bill alleges that at a meeting so held to arrange for such voting "complainants were advised by respondent union that said respondent was unwilling to have any form of an election to ascertain the wishes of The Bootery employees in respect to union membership; and further that until such time as complainants signed a closed shop contract with respondent union the picket line would continue and respondent union would continue to do all in its power to injure complainants' business. Complainants further allege that said respondent union has at no time, and does not at the present time, represent a majority of The Bootery employees, and at the present time said store is fully staffed." The bill also alleges that "respondents seek to coerce and intimidate complainants to enter into a closed shop contract with respondent union which would, in effect, compel and force the said The Bootery employees to become members of the respondent union against the desires of the majority of such employees." It then alleges irreparable damages resulting from the picketing.

There was no answer filed to the bill and no demurrer or other pleading. On hearing the application for a temporary injunction, complainants offered many affidavits supporting the bill, giving details wherein the bill was not so complete. Respondents offered no affidavits, but offered some witnesses who testified orally.

The affidavit of complainant Zeff gave details of the effort in May to arrange for an election, as well as of events prior to that time. We refer now to the May conference. At it there were present "a number of interested persons, including Robert C. Poag, Julian Bailey, Mr. Ikard, Miss Nadine Goad, Mrs. Fay Sizemore, Mr. Raley, and at least eight or ten other persons. Mr. Ikard opened the meeting by saying that we all know the purpose of the meeting and that he would turn the meeting over to Mr. Roger Miniard who was the international representative for the retail clerks' union and would speak for that union. Mr. Miniard took the floor and immediately stated in substance that he was unwilling to agree on any form of an election and that unless The Bootery signed a contract containing a closed shop agreement and union recognition that the picket line would continue, and the entire weight of union economic pressure thrown against The Bootery to injure the business of that establishment."

The respondent offered Mr. Poag who testified that he was an official of the union in March 1952. He and Mr. Baird went to The Bootery and talked with Mr. Zeff. Mr. Baird told him the purpose was to get *union recognition*. Mr. Zeff said he could not agree without Mr. Klibanoff. That they did not mention to him a closed shop. They told him a majority of his employees had signed authorization cards; and that they had knowledge of the letter to Mr. Baird on March 8th, in reply to their telegram. At the time of the strike, "I told Mr. Klibanoff any time we could get together and settle the differences, I would be glad to and reiterated it, and he thanked me." Poag further testified that he could say that they had two union employees at the time of the strike, Miss Goad and Mrs. Sizemore. That he never demanded a closed shop. Further details of the meeting in May were not given by Poag. But he said they could not get together because there were three people part of the management who wanted to vote.

Mrs. Sizemore testified that "we walked out on strike. We were asking for better working conditions, better hours and better pay." She had been picketing ever since March 22d, and paid by the union. That there were seven union members when the strike occurred. Mrs. Goad testified that she was still walking the picket line since March 22, 1952. The strike was about store hours, and that they had talked before about store hours. "They said we wouldn't have any more Wednesday afternoons, and during Christmas we worked extra hours with no overtime pay. * * * Did not have a conversation that morning about working conditions or pay. * * * It was about Christmas when they paid me about four cents an hour for the two extra hours we worked. * * * They had quit talking about it." That was substantially the evidence submitted on the hearing.

Since the Labor Management Relations Act has no application, we are controlled by state law, including statutory, common law and the Constitution. It is settled in this State that to conduct one's business without wrongful interference is a valuable property right. Carter v. Knapp Motor Co., 243 Ala. 600, 11 So.2d 383, 144 A.L.R. 1177; Alabama State Federation of Labor v. McAdory, 246 Ala. 1(54), 18 So.2d 810; Lash v. State, 244 Ala. 48(12), 14 So.2d 229. At the same time workers are entitled to peaceably enforce what they honestly conceive to be their just demands regarding wages, hours and conditions of work and other lawful purposes, and when a controversy arises with their employer, by means of a strike enmeshed with the right of free speech and to picket for that purpose, when it is done in a lawful manner and to accomplish a lawful purpose. Hotel & Restaurant Employees, International Alliance v. Greenwood, 249 Ala. 265, (9), 30 So.2d 696; Alabama State Federation of Labor v. McAdory, supra. Our legislation on that subject is what is known as the Bradford Act, approved June 29, 1943, General Acts 1943, page 252. See Title 26, sections 376, 383, 384, 385 and 390, pocket part Code—and unlawful conspiracy. Title 14, section 54, Code; Lash v. State, supra; Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834.

There is no express provision of State law which either prohibits or permits picketing since Thornhill v. State of Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093, was decided, except as a conspiracy. Title 14, section 54, Code, as interpreted in Lash v. State, supra. Section 388, supra, defines illegal strikes, but it was largely disapproved in the McAdory case, supra. Our statute secures to every person the freedom to join or not to join a union (except as provided in section 391, Title 26, pocket part, Code, not here material) and be free from interference by force, coercion or intimidation or by threats of force or coercion or by intimidation of or injury to his family. Section 383, supra. So that, the right to strike and to picket are controlled principally by the Constitution and the State's public policy as stated in section 376, supra, and those cited above. Set opposite each other is the right of free speech by picketing for a lawful purpose, and the right of one not to be interfered with unlawfully in the management of his business, and the right of labor to work or not to work, and to join a union or not to do so, and to be represented by a bargaining agent of their own selection, or by none at all. Those rights sometimes conflict. Legislation often draws a line between them. Our State statutes have so provided, as here material, in sections 376, 383, 384, 385 and 390, Title 26, pocket part, Code. Under the constitutional right of free speech laborers may picket their employers' business only when it is done in a lawful manner and to accomplish a lawful purpose. It is for a lawful purpose when it is to obtain better wages, hours or working conditions. The picketing here, we think from the evidence, is not to obtain one of those purposes. The complaint about Christmas working hours was not then a live issue. What was said by the two picketeers was of a most general sort; whereas the great weight of the evidence shows that the strike and picketing were initiated and conducted by the union which has all along paid those two women so engaged, and for the purpose of forcing com-

plainants to recognize the union as the bargaining agent for the employees, with authority to so contract as to require all employees to belong to the union when a majority of them have not so consented. Is that a lawful purpose?

Those two picketeers were not acting for themselves but as paid employees of the union. It is not picketing in a true sense by employees but by a union which refuses to allow the employees to say whether they want the union to so act. The placard which they carried gave no indication of a complaint by employees as such. The only complaint there indicated was in respect to the union. The strike as such is not now of importance. But picketing is the trouble—picketing to compel the employer to deal with the union as the bargaining agent of the employees who have never so consented, curtailing their right not to join a union if they so desire.

We have no statutory law in Alabama referring in express terms to a bargaining agent or the manner of selecting one as in the Labor Management Relations Act, 29 U.S.C.A. § 141 et seq. But complainants have apparently manifested the proper spirit to let their employees select one if they see proper to do so, and to negotiate with such agent when selected. The complainants have complied with such proper demands as the union made, but they refuse to recognize the union as the bargaining agent before their employees say so.

In the case of Building Service Emp. Intern. Union, Local 262 v. Gazzam, 339 U.S. 532, 70 S.Ct. 784, 94 L.Ed. 1045, it was held that picketing by a labor union was for an improper purpose when it was to coerce the employees' choice of a bargaining representative, and was not then improperly enjoined when the state permits such free choice. The injunction was limited to restraining petitioners from picketing respondent's hotel for the purpose of compelling him to coerce his employees' choice of a bargaining representative. It was held that such injunction did not violate the First and Fourteenth Amendments of the Constitution. *Picketing is there said to be a form of coercion.* The case of Giboney v. Empire Storage & Ice Co.,

supra, is cited with approval in the Gazzam case, supra, and supports it.

While our statutes do not, as did the Washington statute referred to in the Gazzam case, supra, in express terms provide for freedom of the employees in the selection of a bargaining agent, the right to join or not to join a union free from coercion or intimidation is expressly granted in section 383, supra. That right would not be free from coercion or intimidation, if by the coercion of picketing they may be forced into accepting a contract made by a bargaining agent not the choice of a majority of them, which contract would require all employees to become members. If the employer is forced to accept a bargaining agent, which the majority of his employees have not approved, the employees would be helpless to resist any contract which may be thus put upon them, such as to require them to join the union against their wishes. We think that the policy of this State manifested by its statutes would be thwarted if a majority of the employees of a unit of business were deprived by the coercion of picketing of the right freely to choose a bargaining agent. That is a fundamental right, of which they cannot be deprived. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1(2), 57 S.Ct. 615, 81 L.Ed. 893; Alabama State Federation of Labor v. McAdory, 246 Ala. 1(28), p. 14, 18 So.2d 810.

The question also arises as to whether a majority of the employees may select a bargaining representative with authority to contract with the employer for a union or closed shop, without violating our section 383, supra. That statute does not limit the coercion to be by certain persons or organizations, as the employer or union. Can the bargaining agent agree with the employer for the union shop or a closed shop? We answered in the Greenwood case, supra, that such a contract did not violate section 383, supra. That presupposes the lawful selection of a bargaining agent. In the absence of a statute which provides for such selection, can a majority of the employees do so, acting freely, so that the agent so selected can agree for a union or a closed shop. In the Gazzam case, su-

pra, none of the employees appear to have consented for the union to be the bargaining agent. The report of the Gazzam case does not show whether the statute of Washington made provision for the agent to be selected by a majority of the employees.

The Labor Management Relations Act of Congress does provide in U.S.C.A., Title 29, section 159, section 9 of the original Act, for such selection to be by a majority of the employees, and when selected shall be the exclusive representative of all the employees in such unit for collective bargaining in respect to rates of pay, wages, hours of employment or other conditions of employment. Section 158(a) (3), Title 29, U.S.C.A., shows that such representative may contract with the employer for a union or closed shop. It is unfair practice for a union to restrain or coerce employees, section 158(b) (1) (A) or employers, section 158(b) (1) (B), in the selection of a bargaining representative. But the bargaining representative duly selected under the Act is free to make such a binding contract. The Supreme Court of Missouri in Katz Drug Co. v. Kavner, 249 S.W.2d 166, referred to both the national act and the constitution of Missouri as guaranteeing the employees the right to bargain collectively and be free to select their bargaining representative, and that a majority of the employees could select such representative with power to contract for them all. The state of New York seems to have a similar statute. See, Goodwins v. Frank Hagedorn, 303 N.Y. 300, 101 N.E.2d 697, 20 Labor Cases 66,609, page 80,351.

We think the policy of this State, manifested by our statute and decisions, is that a majority of the employees of a unit qualified for membership in a union in an enterprise, may select a bargaining agent with authority to contract with the employer for all the employees of that unit, including membership in a union as a condition to continue in the employment or enter into it, when all the employees of that unit subject to union membership had a right to participate freely in the selection.

The rationale of our Greenwood case, supra, supports that theory, but in sustaining the picketing in that case there is a controlling difference from this one in the important facts. In that case most of the employees had joined the union and representatives of the union called upon Greenwood "to negotiate for a contract relating to wages, hours and other working conditions of the employees and presented a written proposal as a basis for negotiation, explaining that 'possibly there are several paragraphs that should not be there, but these are open for discussion'." Greenwood did not question the authority of the union as the bargaining agent. There was no apparent purpose to coerce Greenwood to recognize the union as the proper representative. But Greenwood delayed to negotiate for reasons which were not well founded as sufficient for the delay. The picketing was undoubtedly a coercion of Greenwood to negotiate. But his only duty to negotiate was because a majority of his employees had selected the union to represent them as their bargaining agent.

But here we have an effort to force an employer to recognize a union as such agent when at least a majority of the employees have not so designated it, and in that respect the employer was not at fault. The union is not shown to represent as many as a majority of the employees.

Our conclusion is that the picketing is shown by the evidence to be that of the union and for the purpose of coercing complainants to recognize the union as the bargaining agent of all their employees with which complainants must negotiate, with a view of making a contract on behalf of all the employees; but that it is not here shown that the union represents as many as a majority of the employees subject to union membership, or that their wishes have been ascertained in that respect. We also think that the picketing is prima facie shown to cause irrevocable economic damage to complainants' business, whereas an injunction of such picketing, pending final consideration of this cause, could be of little damage to the respondents. The order of the trial court refusing a temporary injunction is reversed and it is ordered by this Court that upon complainants entering into bond in the pe-

nal sum of $500, with good and sufficient sureties to be approved by the register of the circuit court, in equity, and conditioned to pay all damages and costs which any person may sustain by the suing out of such injunction if the same is dissolved, see, Title 7, section 1043, Code, an injunction be issued by the register of the Circuit Court, in Equity, of Lauderdale County to continue until further orders of said court restraining the respondents (appellees here) from picketing complainants' place of business, known as The Bootery, in Florence, Lauderdale County, for the purpose of compelling complainants to recognize respondent Tri-Cities Retail Clerks' Union, an unincorporated association, as the bargaining representative of all the employees of complainants.

The foregoing opinion was prepared by Foster, Supernumerary Judge of this Court while serving on it at the request of the Chief Justice, under authority of Title 13, section 32, Code.

The cause is remanded to the Lauderdale Circuit Court, in Equity, for a compliance with the order here made and for further disposition of the cause.

Reversed, rendered and remanded.

LIVINGSTON, C. J., and BROWN, J., concur.

GOODWYN and MERRILL, JJ., concur in the result.

LAWSON, SIMPSON and STAKELY, JJ., dissent.

LAWSON, SIMPSON and STAKELY, JJ., respectfully dissent on the basis of the interpretation we think has been previously accorded § 383 in the Greenwood and McAdory cases referred to in the majority opinion.

These cases, as we read them, did not construe § 383 as inhibiting peaceful picketing by a minority or that the term "coercion or intimidation, or by threats of force or coercion" embraced peaceful picketing to advertise a labor dispute. Our view is the import of the holdings of these cases is to the exact contrary.

Indeed, in McAdory's case this court struck down as unconstitutional a section of said act (Bradford) which denied the right of a minority to strike—*a fortiori* the rationale would have been applied with equal force to a statute which would have precluded a minority from advertising that strike by peaceful picketing to publicize their grievance in such a labor dispute.

And in Greenwood, while there a majority did go on strike, the court recognized in a minority an equal such right by giving approval to the following quotation on the question from American Law Institute, Restatement of the Law of Torts, p. 120, § 783, Topic 2:

"* * * in the absence of applicable legislation to the contrary, the propriety of an object of concerted action by workers does not depend upon whether the object has the support of a majority of the workers affected. Concerted movements which ultimately gain the support of majorities are frequently begun by minorities."

Likewise in Greenwood, in respect to an attempt to unionize a business, the court had this to say [249 Ala. 265, 30 So.2d 703]:

"That the attempt to unionize the cafe and procure from its operators a union contract was reasonably related to the employees' immediate employment and was a proper object is but one phase of the general principle already decided by this court in the McAdory case, from which we have quoted; and, being a proper object, it was within their right to use all lawful means to enforce their claims by fairly and honestly advertising their cause, including peaceful picketing."

Finally, the legislature has met on several occasions since these two decisions and has made no further enactment contrary thereto or to clarify what is obviously an adumbrant public policy so nebulously expressed throughout the Bradford Act. Believing that such a field is exclusively a matter for legislative expression and determination, we think it sound to adhere to the precepts thus expressed; hence our dissent.