Horace C. Wilkinson, of Birmingham, and T. B. Ward, of Tuscaloosa, for appellant.

18 So.2d 400

### EVANS v. SWAIM et al.

6 Div. 124.

Supreme Court of Alabama.

May 25, 1944.

Rehearing Denied June 22, 1944.

642

Gordon Davis, of Tuscaloosa, for appellees.

GARDNER, Chief Justice.

Plaintiff, A. P. Evans, had long been an employee of the Columbia Mill & Elevator Company, selling its flour on a commission basis since the year 1932. The two officials who gave orders with reference to the performance of his work were one Christley, Secretary-Treasurer, and McKinley, President, of the said Columbia Mill Company (to so abbreviate).

The City of Tuscaloosa was embraced in the territory in which Evans sold the flour of the Columbia Mill Company, and among its customers was the Merchants Exchange, Inc., managed by R. J. Bomar, and in which S. G. Swaim, Bomar's brother-in-law, was a substantial stockholder. On June 28, 1939, plaintiff Evans received a letter from the Columbia Mill Company, written by Mr. Christley, the Secretary-Treasurer, definitely prohibiting him from representing the Company at Tuscaloosa. The letter disclosed that the writer had recently called on the Merchants Exchange,

Inc., at Tuscaloosa and had gone "thoroughly into the matter of our representation there on flour," to use the language of the letter.

The letter further stated that Bomar had told the writer "he was not interested under any circumstances in our flour account as long as you represent us. We, of course, can't afford just to chuck a customer away when they are so hard to find."

Evans' testimony is to the effect that this representation in Tuscaloosa had yielded on an average $100 a month on a commission basis. A few months following the loss of this territory, Evans brought this suit against the Merchants Exchange, Inc., R. J. Bomar, S. G. Swaim, and A. E. Hughes, seeking damages upon the theory that the defendants had wrongfully and maliciously conspired together to cause the Columbia Mill Company to discharge him as its salesman for the sale of its products in Tuscaloosa, Alabama. Upon conclusion of the evidence for the plaintiff the Court, on motion of the defendant Hughes, excluded all the evidence as to him and proceeded with the trial against the remaining defendants. But at the conclusion of all the evidence, the Court gave for these defendants, jointly and severally, the affirmative charge in their favor. There was consequently a verdict and judgment for the defendants, from which the plaintiff prosecutes this appeal.

We may observe in the beginning that the gist of this action is the wrong committed and not the conspiracy; and the allegation of conspiracy may ordinarily be regarded as mere surplusage and need not be proved in order to support the action, as the plaintiff may show by other evidence guilty participation by all defendants in the tort which constitutes the cause of action. This is the generally accepted rule (15 C.J. S., Conspiracy, § 27, p. 1041), and is well established by our own authorities. Illustrative is Howard v. McCarson, 215 Ala. 251, 110 So. 296, 298, where it was said: "But such an allegation of conspiracy is not of the substance of the tort, and is in fact useful merely in aggravation of damages, or in showing a common liability of all for the acts of one." And again in Humphrey v. Terry, 206 Ala. 249, 89 So. 607, 608: "The gist of an action for conspiracy is the damage, and not the conspiracy." See also Louisville & N. R. Co. v. National Park Bank, 188 Ala. 109, 65 So. 1003.

643

A case bearing analogy to that here under consideration is United States Fidelity & Guaranty Co. v. Millonas, 206 Ala. 147, 89 So. 732, 29 A.L.R. 520. There the evidence for the plaintiff tended to show that his discharge was procured wrongfully and maliciously by threat of cancellation of an insurance policy for the purpose of forcing a settlement of his claim favorable to the Company and disadvantageous to himself. Likewise bearing analogy is News Employees' Benevolent Soc. v. Agricola, 240 Ala. 668, 200 So. 748, where plaintiff suffered expulsion from the society because of his suit against it to recover dividends which he claimed to be due. And in Carter v. Knapp Motor Co., 243 Ala. 600, 11 So.2d 383, 144 A.L.R. 1177, complainant was held entitled to injunctive relief against wrongful and malicious interference with its business, defendant in that case attempting to coerce complainant into giving them another car, though complainant had no connection with the sale of the car and was under no obligation to comply with such a demand.

In the more recent case of Lash v. State, 244 Ala. 48, 14 So.2d 229, reference was made to our decisions to the effect that the right to conduct one's business without the wrongful interference of others is a valuable property right which will be protected, if necessary, by injunctive process. And in Hill Grocery Co. v. Carroll, 223 Ala. 376, 136 So. 789, 791, it was observed: "One's business or employment is fully recognized in the law of Alabama as in the nature of a property right. To unlawfully or maliciously interfere therewith, causing the employee to be discharged by his employer, is actionable. That the employment is for no stipulated period, but terminable at the will of the parties, is not of consequence."

In Tennessee Coal, Iron & R. Co. v. Kelly, 163 Ala. 348, 50 So. 1008, 1010, upon which counsel for defendants places reliance, it was said: "One of the rights incident to many, if not all, contracts is to be protected from malicious interference."

Of course, it is too well understood to require repetition here, that if there is evidence from which a reasonable inference could be drawn adverse to the party requesting affirmative instructions in his favor, such instructions should be refused. 18 Ala.Dig., Trial, ☞142, 143; Louis Pizitz Dry Goods Co. v. Waldrop, 237 Ala. 208, 186 So. 151.

The question, therefore, is whether or not there was sufficient proof from which a reasonable inference could be drawn that these defendants, or either of them, wrongfully and maliciously caused plaintiff to lose his employment in the Tuscaloosa territory.

To review the evidence in detail would serve no useful purpose and extend this opinion to undue length. Suffice it to say the testimony has been carefully read and duly weighed, and we feel that a brief reference to the salient facts will serve all purposes.

It is clear enough that plaintiff and Bomar had known one another for a long number of years, and at a time when the latter was buyer and manager of the Alabama Feed & Grocery Company. This Company became very much financially embarrassed, owing some $40,000. Plaintiff loaned the corporation and Bomar, with the endorsement of S. E. and W. W. Deal, the sum of $5,000, which was used in the settlement of this large indebtedness owed by the Alabama Feed & Grocery Company. This matter was concluded late in 1936. There are some details as to stock in this corporation, and its final transfer to Bomar, which need no special mention here. After plaintiff had assisted Bomar in the compromise of a forty-thousand-dollar indebtedness for the $5,000 which he lent, the new corporation was formed, known as the Merchants Exchange, Inc., one of the defendants here. Bomar executed two notes to Evans, one for $5,000, the other for $750.

Plaintiff insists that this latter note was for the purchase price of the stock of the older corporation and also for his services in bringing about so advantageous a settlement. From time to time these notes were renewed. The five-thousand-dollar note was paid down to $1300, with nothing paid on the seven-hundred-and-fifty-dollar note. In the five-thousand-dollar note there was expressly pledged as collateral fifty shares of the capital stock of the Merchants Exchange. Plaintiff insisted that this collateral also was pledged as security for the seven-hundred-and-fifty-dollar note, and would not accept payment of one without the other and surrender such collateral.

The evidence indicates that Bomar was of the opinion plaintiff had added the pledge of this collateral in his seven-hundred-and-fifty-dollar note. At any rate, the controversy thus arose and bad feeling engendered.

In August, 1938, Evans wrote Bomar concerning these notes and giving his version of the matter, informing him at the same time that they were in the hands of an attorney for collection. On January 20, 1939, Bomar wrote Evans asking him not to place "our notes for collection until you hear from me Monday, as I am doing my very best to raise the amount of money." And on the following day Bomar wrote plaintiff another letter, informing him that he was working on a loan, and if unsuccessful, he would sign a new note and "place stock as collateral on both of them and gradually reduce them every sixty days." On January 25, 1939, W. W. Deal, one of the endorsers, offered to pay the thirteen-hundred-dollar note, but demanded the surrender of the collateral. This plaintiff declined. On January 27, 1939, defendant Swaim wrote the Columbia Mill Company the following letter:

"A personal matter between your Mr. Evans and R. J. Bomar has risen to where it looks like we won't be able to do business with you any longer.

"We like your flour, like to do business with you, and expect to wind our relations up with you in a very satisfactory manner.

"We do think that this personal matter has gotten to the point where the relations will not be satisfactory to deal thru Evans since he sees fit to enter suit against Bomar.

"The writer's interest extends to the point that I will not sit idly by and see Bomar sacrifice his interest in the business to Evans' advantage. You will find copy of letter I wrote Evans which failed to hit the spot, therefore we are preparing to handle another flour account and will close yours out as rapidly as possible. We do not think the relations can remain satisfactory with the feeling that exists between Evans and Bomar and this letter is written you with fairness to you and ourselves which will suffer.

"You should also know so that you may get you another account to sell your flour when we shall have cleaned out and paid up."

On March 16th following, Evans filed suit on the two notes, which were later settled for $1700. And on March 25, 1939, only a few days after these suits were filed, Bomar and defendant Hughes (the latter had long been in the employ of the Merchants Exchange, Inc.) went to Columbia, Tennessee, where plaintiff's employer was located. They talked with the Secretary-Treasurer. Bomar informed him that they could no longer buy their flour so long as Evans represented them.

The proof indicates that Bomar did not take this position until after these suits were filed, as he felt he had been mistreated. It is clear, too, the jury could infer that the plaintiff's pending suits were discussed. This was the first trip that Bomar and Hughes had made to the Columbia Mill's place of business. The Secretary-Treasurer of the Columbia Mills testified that the matter of dispute between Bomar and Evans was discussed in the conversation with Bomar and Hughes on this March 25, 1939, trip. This trip was suggested by Hughes. He knew the suits against Bomar were pending when he made this trip, and they were discussed with the Secretary-Treasurer of plaintiff's employer. Hughes told one of the customers (Reynolds): "We have got it straightened out and I can sell you that flour; we have made arrangements to buy it direct and cut Mr. Evans out of his commission."

We have previously referred to the fact that Swaim was Bomar's brother-in-law, a stockholder in the Merchants Exchange, Inc., familiar with the lawsuit, and had written the letter to the Columbia Mill Company, the substance of which was that if it wanted to do further business with the Merchants Exchange, Mr. Evans would have to be removed. His letter also refers to the suit by Evans against Bomar, and that he would not sit idly by and see Bomar sacrifice his interest in the business to Evans' advantage. He made Evans two offers on Bomar's note and security: one, 25 cents on the dollar, and another, 50 cents on the dollar, which Evans declined. Evans offered Swaim 50 cents on the dollar for his stock, which he declined. At this time Swaim told Evans that he (Evans) was a minority stockholder in the concern and might as well accept his offer, as a minority stockholder had no chance of ever collecting anything. Swaim, on January 22, 1939, wrote to Evans, defending Bomar's position in the matter, and attempting to dissuade him from entering suit, a copy of which letter he sent to the Columbia Mill Company.

In July, 1939, a short period after plaintiff's territory in Tuscaloosa was taken from him, Swaim made an automobile trip to Columbia to the Columbia Mill Company, stating that he made the trip for the purpose of selling them some "hot peas,"

though he admits that Company did not deal in or handle them. In view of the unreasonable excuse for this trip, we are inclined to the view an adverse inference may be drawn, and that the jury could infer that in fact the trip was not made for the stated purpose, but had some connection with the dispute between Bomar and plaintiff, and perhaps anticipated testimony in the threatened litigation concerning plaintiff's discharge. People v. Arnold, 43 Mich. 303, 5 N.W. 385, 38 Am.Rep. 182.

But we forego further discussion of the evidence. Counsel for defendants lay stress upon the statement in Tennessee Coal, Iron & R. Co. v. Kelly, supra, that if a third party has the legal right to do what he did, although it resulted in the discharge of a servant, it is not an actionable wrong, though actuated by a malicious motive against the servant. This principal was reiterated in Comerford v. International Harvester Co., 235 Ala. 376, 178 So. 894, 895. In the Kelly case, it will be noted that the affirmative charge does not appear to have been requested, as appears from an examination of brief of counsel as well as from the opinion of the Court. It seems to have been conceded by all that a jury question was presented. The Comerford case involved the right of an employee to recover from his employer damages for his discharge under a contract which gave to the employer the perfect right to discharge him at any time and for any cause. The Court makes the distinction in cases of that character, and that here involved, by the use of the following language: "At the outset, we distinguish this case from United States Fidelity & Guaranty Co. v. Millonas, 206 Ala. 147, 89 So. 732, 29 A.L.R. 520, in that this suit is not against one for maliciously procuring the discharge of plaintiff by his employer, but is against the employer who discharged plaintiff in the exercise of a right to do so."

Counsel for defendants insists that these defendants had a legal right to discontinue business with the Columbia people. This is, of course, conceded. But we think the proof would justify the inference that the purpose behind the entire proceeding was to get a settlement of the litigation between the plaintiff and Bomar; or if carried to a conclusion, procure a modicum of revenge for instituting the litigation. This controversy between plaintiff and Bomar bore no relation to business dealings between the Columbia Mill Company and the Merchants Exchange, Inc.

As observed by the Illinois Court in London Guarantee & Accident Co. v. Horn, 206 Ill. 493, 69 N.E. 526, 530, 99 Am.St. Rep. 185, cited in United States Fidelity & Guaranty Co. v. Millonas, supra: "A desire to compel the employe to surrender a cause of action wholly disconnected with the continuance of his employment does not afford justification for interference by a third party, who desires the satisfaction of the alleged liability." See also 30· Amer. Jur. p. 69. And in the notes to Sorenson v. Chevrolet Motor Co., 84 A.L.R. 35, many authorities are cited upon the question of justification of interference with employment. On pages 79–82 numerous authorities are cited to the effect that a prima facie case is established by proving a breach of contract to have been intentionally procured, thus shifting to the defendant the burden of showing that his conduct was justified. ·The same rule, of course, is established against one who intentionally brings about the loss of another's employment. In 30 Amer. Jur. p. 80 numerous authorities are cited to like effect.

Generally the question of justification is one for the jury's consideration. See authorities cited in Notes, 84 A.L.R. on page 81.

■ Here it is clear enough the jury could reasonably infer that each of these defendants was implicated in intentionally bringing about plaintiff's discharge from his Tuscaloosa territory. Whether or not such was the case, and if so, whether or not there was justification, were questions for the jury to consider and determine.

It is clear that the question of justification is one. which must rest upon the peculiar circumstances of each case. We think the tendencies of the evidence fall within the rule of the Millonas case and others which we have hereinbefore cited of like nature, and that the court committed error in taking the case from the jury.

It results that the judgment stands reversed and the cause remanded for further proceedings in the court below.

Reversed and remanded.

THOMAS, FOSTER, LIVINGSTON and STAKELY, JJ., concur.