**KELITE PRODUCTS, Inc., and R. C. Martin, Appellants,**

v.

**Alvin J. BINZEL, Jr., trading as Kelite Products of Alabama, Appellee.**

No. 15258.

United States Court of Appeals Fifth Circuit.

June 15, 1955.

Drayton T. Scott, Joseph F. Johnston, Cabaniss & Johnston, Birmingham, Ala., of counsel, for appellants.

John D. Higgins, A. Leo Oberdorfer, Taylor, Higgins, Windham & Perdue, Birmingham, Ala., of counsel, for appellee.

Before RIVES, TUTTLE and CAMERON, Circuit Judges.

TUTTLE, Circuit Judge.

This action was brought in a state court by Alvin J. Binzel, Jr., then doing business under the firm name of Kelite

Products of Alabama, against Kelite Products, Inc., and R. C. Martin, and was duly removed by defendants to the United States District Court for the Northern District of Alabama, the requisite diversity of citizenship and amount in controversy being present. The original complaint was in three counts, a fourth count being added later by a supplemental complaint. Count 1 alleged that defendants maliciously and without probable cause occasioned the withholding and non-delivery of mail addressed to Kelite Products of Alabama by the Postmaster of Birmingham, Alabama. Count 2 alleged the conversion of a certain carload of merchandise, the property of the plaintiff. Count 3, relating to slander of title to the mail, was dismissed by order on pretrial hearing for failure to state a claim, and is no longer involved in the controversy. Count 4 alleged the continued withholding of mail as in count 1, up to the time of the supplemental complaint. The complaint demanded both compensatory and punitive damages. The answers asserted that the complaint failed to state a claim, admitted the allegations of residence of the parties and that the defendants issued written notice to the said Postmaster to deliver mail addressed to Kelite Products of Alabama to Kelite Products, Inc., and denied each and every other allegation of the complaint. The answer of Kelite Products, Inc., also asserted a counterclaim for wrongful use by plaintiff of a trade secret, namely a list of customers; maliciously interfering in the relations of Kelite Products, Inc., with its customers; wrongfully using a trade name and telephone number; and prayed for an injunction, an accounting, and damages. The reply to the counterclaim is not in the record.

By orders on pretrial hearings, Rule 16, Fed.Rules Civ.Proc. 28 U.S.C.A., the trial court deferred trial of the equitable counterclaim pending trial of the legal issues presented in the pleadings, in accordance with Rule 42(b), Fed.Rules Civ. Proc. The parties also agreed in these orders that defendant asserted as an affirmative defense to count 2, that the alleged conversion was the rightful exercise of a power to rescind for mistake or fraud. These legal issues were then tried to a jury. Defendants moved for a directed verdict, which was refused. The jury returned a verdict for plaintiff in the amount of $15,000. Defendants then moved for judgment *n. o. v.* or in the alternative for a new trial. The court denied this motion, and, deeming that there was no just reason for delay because of the pendency of the counterclaim, entered final judgment for plaintiff on the verdict, as it was authorized to do by Rule 54(b), Fed.Rules Civ.Proc. The defendants have appealed from that judgment, asserting errors which we may restate concisely as follows:

1. Denial of motion to dismiss counts 1 and 4 for failing to state a claim.

2. Failure to direct a verdict on all counts for appellants.

3. Refusal to give requested charges relating to appellants' defense of rescission on count 2.

4. Refusal to charge that only nominal damages could be recovered on counts 1 and 4, and that no punitive damages could be recovered on any count; and to give requested instructions as to the definition and allowance of punitive damages.

5. Failure to grant a new trial because the verdict was contrary to the weight of evidence and excessive in amount.

The following statement summarizes the evidence, which was undisputed except as otherwise stated:

Kelite Products, Inc., is a manufacturer of industrial cleaning compounds and machinery under the registered trade name "Kelite." Binzel, the plaintiff, was first employed by Kelite in 1946 as a salesman on a salary basis and later on a commission basis. Over his term of service as a salesman the volume of sales of Kelite products in Birmingham alone was increased from $300 to $4000 a month. On October 28, 1949, Binzel contracted in writing with Kelite to act as exclusive distributor of its products in Alabama, Mississippi, and northwest Florida.

·Pursuant to this contract plaintiff conducted a business under the style of Kelite Products of Alabama and maintained a warehouse and stock of merchandise. The contract provided that Binzel might use the name Kelite so long as the contract remained in effect,[1] and that he would have the right on termination of the contract to sell any inventory then on hand. The contract was to last for five years with options in Kelite to terminate at the end of any year that Binzel failed to attain specified quotas of gross sales. The quota for the year ending October 31, 1952, was $126,000, and Binzel failed to meet this quota. There had been certain parol modifications of the contract, granting Binzel a freight allowance on merchandise shipments from Kelite's Los Angeles and New Jersey plants in addition to his usual 35% discount from list price.[2] Louisiana was also at one time added to Binzel's territory, and his quota was then increased. According to Binzel's testimony, his relations with Kelite were not entirely harmonious for a year or two preceding their final breach. The freight allowance was a particularly sore subject and source of bickering. When Binzel began to lag in sales, defendant R. C. Martin, then manager of Kelite's Central Division at Dallas, came to Birmingham in August, 1952, to discuss the matter. They agreed in writing that Binzel would give up his exclusive distributorship in Louisiana and Mississippi, but would continue to receive the freight allowance. Binzel testified positively that Martin also agreed that the contract would be continued for two more years, waiving the failure to sell the prescribed quota. Martin contradicted this testimony. Nothing appears to have been said there about diminishing the quota by reason of Binzel's lost territory. On October 3, 1952, L. C. Sorenson, President of Kelite, came to Birmingham to discuss the renewal of the contract and the matter of freight allowances. Binzel told him he understood that the contract had already been renewed, but Sorenson replied that it had not, and gave Binzel three choices: to take a position as Division Sales Manager at $750 a month plus travelling expenses, to become a salesman on a 19% commission, or to continue the distributorship with changes in the telephone listing, sales quotas, and freight allowance. Binzel said he was not interested in anything other than the present arrangement, which he had agreed with Martin to continue. No definite agreement was reached at this conference, and the evidence is conflicting whether Binzel was to submit a proposed sales quota to Sorenson, or Sorenson was to send a proposed new contract to Binzel for approval. Neither was done, and by letter of October 30, 1952, Kelite exercised, or purported to exercise, its option to terminate the contract. On November 2, Binzel telephoned Sorenson asking him what he meant by the letter of termination and saying he needed certain merchandise to fill orders anticipated or already accepted. At Binzel's request Sorenson agreed to send a new contract to Binzel for his approval, and also authorized him to order another carload of merchandise for which the freight allowance would be given him. Plaintiff ordered this carload on November 7, 1952, by air mail letter, and was advised that the goods would be shipped on November 13. Then he received a telegram reading: "Regarding stock car order No. 33 there will be no freight allowance wire acceptance."

1. The provisions of the contract as to use of the name Kelite were as follows: "That the Manufacturer hereby consents to the use of the word 'Kelite' in the corporate name of the distributor during such period as this agreement remains in force and effect, and the distributor agrees, upon the cancellation or termination of this agreement, to take such steps as may be necessary to cause its corporate name to be so changed as not to include the word 'Kelite' or any similar word therein."

2. Binzel paid 19% to salesmen working for him and paid overhead out of this markup. He received a smaller discount on machinery. Merchandise was customarily sold to retail customers on terms of 1% discount on payments within 10 days, net in 30 days.

Binzel wire: "Release stock order No. 33 to Kelite Products of Alabama." About November 18, the car arrived in Birmingham consigned to Binzel, but the railroad had been instructed to hold it pending instructions from Martin. After several telephone conversations between Binzel and Martin in which the latter refused to release the car, Martin discussed the matter of the car at Kelite's main offices in Los Angeles, and thereafter came to Birmingham and met Binzel on November 24. He informed him there that it was all over, that Kelite was giving him neither a new contract nor the carload of merchandise. Stock car 33 was then delivered to another warehouse to be held for Kelite Products, Inc. On November 24, Martin gave written notice to the Postmaster that the mail addressed to Kelite Products of Alabama be delivered to Kelite Products, Inc.[3]

some wax and hydrochloric acid which Kelite did not sell. After receiving the letter cancelling the Kelite contract, Binzel informed Greffoz thereof and Watson offered Binzel a distributorship. Various correspondence followed, but Binzel did not place any orders for merchandise with Greater Mountain until November 24, immediately after Martin had informed him "it's all over." This first order was a duplicate of the order for stock car No. 33. Appellants admit that neither Kelite nor any of its agents had any notice of Binzel's dealings with Greater Mountain until after the diversion of stock car 33, but they rely upon their subsequent learning of those dealings as justifying the diversion, as a rescission for fraud or mistake.

Pursuant to the notice to the Postmaster, several pieces of mail addressed to Kelite Products of Alabama were di-

3. Form 22
   (Rev. 11-50)                    Kelite Prod. of Ala.
   (Print name of person or firm changing address—
   Last name first)
   Order To Change Address
   (Important—Please read instructions on reverse side)
   Permanent (expires after 2 years) or Temporary until .................,
   Inclusive.
   Old address....Kelite Prod. of Alabama, Firm Mail Only.
   New address...Kelite Prod. Inc. P. O. Box 366
                  (Number)             (Street)
                                                      11/25/52
   (City)         (Zone number)       State      (Effective date)

   NOTE. Check below if you will guarantee forwarding postage for—     Check below whether this change of address is for—
   Magazines [ ] Circular matter [ ]    Entire family or firm       [ ]
   Newspapers [ ] Parcel Post    [ ]    Individual signer only      [ ]

   Write signature /s/ R. C. Martin, Gen. Mgr. Kelite Prod. Inc.
   (Patron, or if authorized agent,       .............
   give title)                 (Date)

Meanwhile, starting in September, Binzel had received a visit and communications from Messrs. Greffoz and Watson, formerly associated with Kelite, relative to his becoming a distributor for a corporation they intended to organize to be named Greater Mountain Chemical Company. This company was to manufacture products in competition with Kelite. Initially, Binzel said he was not interested. He was given a list of comparative prices. Binzel did correspond with Greater Mountain in October concerning

verted to Kelite Products, Inc. Soon after the Postmaster received the change of address card on November 24, Binzel called on the Postmaster in person and wrote a letter to him, protesting the diversion of mail. The Postmaster thereafter held up a considerable quantity of mail addressed to Kelite Products of Alabama, including checks, statements of account, and invitations to bid. The Postmaster held a conference with Martin, Binzel, and their attorneys. Martin stated that he did not want any personal

letters of Binzel's or any checks, but only future orders for Kelite products. The Postmaster suggested appointment of a receiver, to which proposal all but Binzel were amenable. Immediately thereafter this action was commenced, and all mail was handled subsequently by court order, whereby Binzel received the original mail and Kelite was furnished photostats. No mail addressed to Binzel's company was delivered to him for a period of days after the change of address card was filed by Martin.

The first specification of error as above restated is that counts 1 and 4 should have been dismissed because they do not state a claim. We find no merit in this conclusion or in any of the three premises relied upon to support it, which appellants state in the outline index of their brief as follows:

"The facts do not fit into any of the basic causes of action.

"The only cause of action is in the nature of malicious prosecution, and Appellee has failed to allege and prove the necessary elements.

"The allowance of a cause of action results in the interference by a court in the orderly machinery of the Post Office Department."

Appellants discuss a number of possible theories upon which tort liability might be predicated, and say that none applies to these counts. But our inquiry into Alabama tort law convinces us that that law is not as they state it. Since some dispute exists as to whether certain elements, particularly "malice," are necessary to make appellants liable under the several possible theories, it is appropriate to enumerate the kinds of tort which may be involved, and to determine the constituent elements of some of them. We think the torts that may be comprehended in the transactions which form the basis for counts 1 and 4 include:

(1) Interfering with contractual relations;

(2) Wrongful initiation of administrative proceedings;

(3) Intentional infliction of harm to the business of another without justification; and

(4) Civil conspiracy.[4]

Appellants say that (1) is not a recognized basis of tort liability in Alabama;[5]

---

4. We do not mean to imply that there may not be other bases of tort liability involved in interference with one's mail. The technical requirements of slander of title may in some cases be present. Negligent or intentional unjustified interference with mail may well be actionable even if it does not interfere with the plaintiff's business (see Cohen v. Cohen, 26 Tex.Civ.App. 315, 63 S.W. 544) or even if it does not deprive him of a bargain; for it is easy to conceive cases in which interference with one's mail could cause financial harm of other kinds, and physical harm as well as severe emotional disturbance. We do not mean to draw any limits to such liability here, but merely to apply recognized Alabama law to the present case.

See Kennedy v. Dr. David Kennedy Corp., 32 Misc. 480, 66 N.Y.S. 225, 229:

"It ought to be an extremely difficult matter for one person or corporation to obtain the right to open and examine another person's private correspondence without his consent. There is something so repugnant in such a proposition to all our ideas of common fairness that to simply state it is to arouse antagonism thereto."

5. They cite Erswell v. Ford, 208 Ala. 101, 94 So. 67, for this contention. But their interpretation of this case and of the Alabama law is not correct. In Louisiana Oil Co. v. Green, 230 Ala. 470, 161 So. 479, 481, it was said:

"It is our understanding that the effect of our cases is to hold that no such claim of damages [i. e., for interfering with contractual relations] is recoverable in any form of action, unless it interferes with one's business, trade, or employment, or, as pointed out in Erswell v. Ford, supra, coercion or fraud is used."

Since both interference with Binzel's business and livelihood and also fraud (as to the identity of Kelite Products of Alabama) could be inferred from the evidence in this case by the jury, under either exception the plaintiff can correctly be said to have made out a case of the tort of wrongfully interfering with the contractual relations, etc., of Binzel and his customers, sufficient to go to the

that (2) is *res nova* in Alabama, and that if such a tort should be recognized, the indispensable element of termination of the proceedings in plaintiff's favor is missing; and they do not even comment on (3) and (4) except to beg the question by saying that appellants "had a right" to notify the Postmaster of a change of address. As pointed out in the margin, note 5, contrary to appellants' contention, (1) is a theory which could be applied here. As for (2), we think it is inappropriate and unnecessary to discuss the matter, there being no Alabama law on the point. As for (3)[6] and (4)[7], the law is clear that such causes of action exist in Alabama, and that sufficient facts were proved to make out a prima facie case under either of these theories. Of the three theories made out by the proof, (1), (3), and (4), it appears that the parties and the court treated the case as one under (3); the complaint, proof, and instructions were all quite appropriate to that conception of the case. We have no doubt that the parties consented to trying all the issues involved in that theory

of the case, Rule 15(b), Fed.Rules Civ. Proc., and that counts 1 and 4 were sufficient.

The tort alleged, then, was intentional harm to plaintiff's business without justification. We think it clear that the evidence was sufficient to find every element existed, namely the intentional act, some consequential harm, that the harm was to plaintiff's business, and that there was not sufficient justification.[8] The only one of these elements requiring discussion here is that of justification. Such justification must naturally be one which the law will recognize. Advance Music Corp. v. American Tobacco Co., 296 N.Y. 79, 70 N.E.2d 401. Sometimes the justification for harmful conduct is the exercise of an obvious and recognized privilege, as that of excluding or ejecting trespassers from one's land. Brooks v. Ingram, 186 Ala. 106, 65 So. 138. But more often the extent of the claimed privilege involves many complex variables and often legislation; it is often said that if the objective sought is illegal[9] or the means used

jury under Alabama law. See also Barber v. Stephenson, 260 Ala. 151, 69 So.2d 251, 255.

**6.** Klibanoff v. Tri-Cities Retail Clerks' Union, 258 Ala. 479, 64 So.2d 393, 396; Bankers' Fire & Marine Ins. Co. v. Sloss, 229 Ala. 26, 155 So. 371; Carter v. Knapp Motor Co., 243 Ala. 600, 11 So. 2d 383, 144 A.L.R. 1177. See also Birmingham Broadcasting Co. v. Bell, 259 Ala. 656, 68 So.2d 314. Other Alabama cases are collected in 9 A.L.R.2d 228, and A.L.R.2d Supp. Service (1955) 334–335.

**7.** Barber v. Stephenson, 260 Ala. 151, 69 So.2d 251, especially at page 254 where the elements of such a cause of action are set out; Bankers' Fire & Marine Ins. Co. v. Sloss, 229 Ala. 26, 155 So. 371, 376. But see Evans v. Swaim, 245 Ala. 641, 18 So.2d 400, 401, where it is said that allegations of conspiracy are surplusage and a cause of action of some other sort must be shown by the complaint. Thus it appears that the Alabama cases are in some conflict whether conspiracy is really a different tort from intentional unjustified harm to business, just as there is a division of authority on the point in other jurisdictions. See 9 A.L.R.2d 228, 231. The Barber case

seems to be the latest pronouncement on the matter.

**8.** These factors seem clearly to be all that are involved in such a cause of action. See cases cited in notes 7 and 8, infra. Certain cases say "malicious" harms of this sort are actionable, but it is clear that they do not hold malice to be an essential element in the sense of "ill will." Birmingham Broadcasting Co. v. Bell, 259 Ala. 656, 68 So.2d 314. The term malice is ambiguous (see 9 A.L.R. 2d 228, 241; Restatement, Torts, Division 7, Introductory note) and may mean also the intentional doing of a harmful act without justification. This is of course an element of this tort by definition. We think it well to eliminate the term malice from the definition, since it adds nothing to the definition herein stated and may be misleading. Likewise, it is misleading to embellish the definition with other objurgatory epithets as "wanton," "reckless," or "wrongful," for these are not additional necessary elements of the tort, though aggravation may justify the imposition of punitive damages.

**9.** E. q., Barber v. Stephenson, 260 Ala. 151, 69 So.2d 251 (objective was to acquire a business without paying for it); Carter v. Knapp Motor Co., 243 Ala.

are improper [10] the actor's harmful conduct is not privileged. The principles stated in Restatement, Torts, § 767, "Factors in Determining Privilege," and the comments thereto, we believe to be in full accord with the Alabama cases; applying these principles to the proof in the present case, there is no doubt that the jury could find that the conduct of appellants was not justified. It could certainly be inferred from the evidence that appellants made a fraudulent representation to the Postmaster that Kelite Products, Inc., *was* Kelite Products of Alabama or had permission from the latter to order a change of address. This is true even though the change of address card was marked "firm mail only," of course.

It must be remembered that this was not an open request by the Kelite Corporation of California to the Postmaster requesting him to stop delivering mail to Binzel, doing business as Kelite Products of Alabama and to deliver the mail to it instead. No such request was made of the Postmaster, presumably because no such request would be, or could be, complied with. Instead, the filing of the change of address card was a patent falsification of fact. Martin signed the request for change of address as the "patron," clearly implying that he was the patron whose initial address was given on the line marked "old address." The plain and clear meaning of this change of address card was as though Martin had said to the Birmingham Postmaster, "I am the post office patron now receiving mail at 1920 5th Avenue, North, Birmingham, Alabama. I desire to have *my address* changed for firm mail only to Post Office Box 366."

The natural result of this notice was to divert Binzel's mail to Kelite Corporation, and this actually happened. This was a most serious and dangerous thing for appellants to do, however strong their feeling of justification may have been. The interference with another's mail is so grave an impropriety under our modern system of government that the Congress has long sought to prevent it by criminal statutes.[11]

Ordinarily fraud is an improper means. Restatement, Torts § 767, Comment *b*,

600, 11 So.2d 383, 144 A.L.R. 1177 (object was to compel car dealer to rescind sale of a car, to which the buyer had no right); Evans v. Swaim, 245 Ala. 641, 18 So.2d 400 (revenge sole object, with no relation to defendant's economic self-interest); Scalise v. National Utility Service, Inc., 5 Cir., 120 F.2d 938 (object of taking out a corporate charter was to prevent a foreign corporation from obtaining an adjudication on the merits of a lawsuit). The objective of creating an illegal restraint of competition, even by lawful means, is another obvious example. Restatement, Torts, § 768(c).

10. Barber v. Stephenson, 260 Ala. 151, 69 So.2d 251 (means included fraudulent representations); Louisiana Oil Corp. v. Green, 230 Ala. 470, 161 So. 479 (fraud); Russell v. International Union, 258 Ala. 615, 64 So.2d 384 (physical violence); Sparks v. McCreary, 156 Ala. 382, 47 So. 332, 22 L.R.A.,N.S., 1224 (slander of title and threats to prosecute customers); Original Ballet Russe v. Ballet Theatre, 2 Cir., 133 F.2d 187 (defamation used); It seems that the old case of Citizens' Light Heat & Power Co. v. Montgomery Light & Water Power Co.,

C.C.M.D.Ala., 171 F. 553, is not a correct statement of the present Alabama law.

11. 18 U.S.C.A. § 1702 provides that "Whoever takes any letter, postal card, or package out of any post office * * * before it has been delivered to the person to whom it was directed, with design to obstruct the correspondence, or to pry into the business or secrets of another, or opens * * * the same, shall be fined not more than $2,000 or imprisoned not more than five years, or both."
18 U.S.C.A. § 1703 provides: "Whoever, without authority, opens, or destroys any mail or package of newspapers not directed to him, shall be fined not more than $100 or imprisoned not more than one year or both. * * *"
18 U.S.C.A. § 1708 provides: "Whoever * * * by fraud or deception obtains, or attempts so to obtain, from or out of any mail, post office, or station thereof, [or] letter box * * * any letter, postal card, package, bag, or mail, or abstracts or removes from any such letter * * * any article or thing contained therein * * * shall be fined * * *."

and cases cited in footnote 10. Appellants cannot stand on the proposition that their avowed objective of obtaining the profits on future orders requesting Kelite products by brand name, was of such transcendent importance that it gave them the privilege of using fraudulent means and subjecting Binzel to the annoyance and losses naturally incident to interrupting and at least delaying the mail unmistakably directed to him at his business address. It must also be taken into account that Binzel had the express contractual right to sell Kelite products in his $11,000 inventory, so not only could the jury find that the means employed by appellants were fraudulent and oppressive, but their avowed objective amounted to curtailing his exercise of that right. And the jury could well have believed from the surrounding circumstances that their actual objective was even less commendable; to coerce Binzel to go back to work for Kelite on the latter's terms by disrupting his business or even to prevent him from receiving invitations to bid. It is abundantly clear that a jury could find that appellants' conduct was unjustified even by the rough and tumble ethics of the market place. See Evans v. Swaim, 245 Ala. 641, 18 So. 2d 400, 404.

There is nothing contrary to this conclusion in Ranft v. Reimers, 200 Ill. 386, 65 N.E. 720, 60 L.R.A. 291. That case simply stands for the proposition that a person has the privilege of directing the post office to deliver mail addressed to his *own* trade name to a new address, even though a competing business is operating under a different trade name at the old address. That is not the case here. Nor is this a case where an individual has sold the right to use a trade name practically identical with his own name, so that it is so difficult to separate his letters from those intended for the vendee that the only solution is to appoint a permanent receiver, as in Dr. David Kennedy Corp. v. Kennedy, 165 N.Y. 353, 59 N.E. 133, see also the connected case, Kennedy v. Dr. David Kennedy Corp., 32 Misc. 480, 66 N.Y.S. 225. It might be that the peculiar circumstances in that case, together with the contemporaneous establishment of free delivery by the Post Office, might justify what the defendant there did; but at any rate it is not clear whether damages were or were not recovered in that case.

■ As for appellants' argument that Binzel must exhaust his administrative remedy before bringing suit, it is clearly without merit under postal regulations, 39 C.F.R. § 43.33, which provides that court orders as to disposition of mail shall be obeyed by postal authorities. The administrative remedy provided in 39 C.F.R. § 43.35 is simply a way of disposing of disputed mail as an alternative to a lawsuit, and does not even purport to provide any manner of compensating an addressee for tortious injury. Central Trust Co. v. Central Trust Co. of Illinois, 216 U.S. 251, 30 S.Ct. 341, 54 L.Ed. 469, and Griffith v. W. S. Vick Grocery Co., 6 Cir., 272 F. 246, involve simply the degree of conclusiveness to be accorded administrative findings of fact. This case does not involve any such findings of fact. National Life Ins. Co. of U. S. v. National Life Ins. Co., 209 U.S. 317, 28 S.Ct. 541, 52 L.Ed. 808, involved a similar question of the reviewability of an exercise of administrative discretion in a mail dispute, but here the Post Office never took any action sought to be reviewed. What those cases said about court interference with the exercise of administrative discretion clearly has no application to the instant case.

■■ What we have said so far disposes of the appellants' contentions that the court erred in failing to dismiss counts 1 and 4 or to direct a verdict on those counts. We proceed to consider whether the court erred in refusing to direct a verdict for appellants on count 2, or to grant appellants' requested instructions relating to their claimed right of rescission. It is clear that under the Uniform Sales Act § 19, in effect in Alabama and all other states involved, the ownership of the goods passed to Binzel when they were delivered to the carrier. The fact that appellants intercepted the goods and applied them to their own use

is undisputed. The only serious contention made by appellants in this matter is that Kelite had a right of rescission because of Binzel's allegedly fraudulent non-disclosure of his dealings with Greater Mountain, or Kelite's unilateral mistake that Binzel intended to continue as a distributor of Kelite products. This contention was the basis of the motion for directed verdict and also of appellants' requested charges 51, 52 and 53, which the court refused. We think there was no error in either regard, because there was no evidence of any misrepresentation, fraudulent non-disclosure, or that Kelite made any *reasonable* mistake of fact, or any mistake at all known to Binzel. On the contrary, all the evidence showed that Binzel's contract had been cancelled by Kelite and that he had not misrepresented his intentions, but had refused to enter any contract on the terms demanded by Kelite. Certainly after Kelite severed the already strained relationship, whether it was fiduciary, confidential, or one of ordinary contract, there was no relation of any kind which could justify Kelite in expecting that its best interests would thereafter be cared for by Binzel. Consequently the lack of disclosure of Binzel's negotiations with Greater Mountain was privileged (Restatement, Contracts § 472(1) (c) ) and could not be a ground of rescission. Nor can we see any evidence from which it could be inferred that Kelite was under any reasonable misapprehension of fact. Binzel had made his position quite clear that he did not intend to accept the terms offered by Kelite, but that he might accept better terms. Kelite could not reasonably have believed that Binzel was not looking around for another livelihood after the cancellation of the contract. We are satisfied, then, that appellants were not entitled to a directed verdict or the requested charges, because there was no evidence to support their theory of the case.

It is true that the court's instructions used the term "conversion" without defining it, but this insufficiency in the instructions was waived by appellants' failure to object. The instructions requested by them did not contain a definition of conversion.

Proceeding now to the matter of damages, we are of the opinion that the court committed prejudicial error in failing to give sufficient instructions as to the permissibility of awarding punitive damages. All that the jury was instructed in this regard was the following:

"As to the compensatory damages, * * * the measure of damages is such sum as will compensate the person injured for the loss sustained, with the least burden to the wrongdoer consistent with the idea of fair compensation, and with the duty on the person injured to exercise reasonable care to mitigate the injury. * * *

"Now with respect to punitive damages, you would be governed by this rule. While jurors in the assessment of punitive damages are given a discretion in determining the amount of damages, this discretion is not an unbridled or arbitrary one, but a legally sound and honest discretion. In arriving at the amount of damages that should be assessed, if you, of course, are reasonably satisfied from the evidence that the Plaintiff is entitled to recover punitive damages, due regard should be had to the enormity or amount of the wrong, and to the necessity of preventing similar wrongs. In short, punishment by way of damages is intended not only to punish the wrongdoer, but as a deterrent to others similarly minded. * * * In other words, punitive damages, and they are known as exemplary damages or vindicative damages are awarded for the purpose of punishment. Compensatory damages are awarded to compensate.

"Now, gentlemen, the complaint in this cause, counts one and four of the complaint, aver that the Defendants wrongfully and maliciously caused Plaintiff's property to be seized, withheld, and detained. Now the word 'wrongfully' of course is a word of common acceptation and meaning. And no particular definition is required I think with respect to that. But the word 'maliciously' should be defined. An act must be shown to be

wrongful or unlawful to establish that it was maliciously done. Whatever is done wrongfully, vexatiously, and purposely, or unlawful acts willfully done is maliciously done. Now, there are other definitions that could be given. Here is one here. Malicious or maliciously means any unauthorized interference, or any interference without legal justification or excuse, and personal ill will or animosity is not essential."

On careful consideration, we are of the opinion that these instructions were not sufficient to convey to the jury the essential notion that they must not award punitive damages for just any tortious conduct, but only for torts where there is some element of aggravation. The definition contained in appellants' requested instruction No. 46, which was refused by the court,[11a] and which appears to have

been adopted from Restatement, Torts § 908, Comment *b*, may not be entirely and *absolutely correct under the Alabama law*:

"46. The Court charges the jury that punitive damages may be awarded only for outrageous conduct, that is, for acts done with a bad motive or with a reckless indifference to the interests of others."

But the court should not have failed to give a definition of punitive damages approved by the Alabama courts, or a definition of his own. From a study of the Alabama cases on punitive damages, we conclude that the rule may be fairly summarized as follows:

To subject a wrongdoer to punitive damages, the jury must find that he acted with actual malice (in the sense of ill will) [12] or conscious disregard of conse-

---

11a. There was a sufficient compliance with Federal Rules of Civil Procedure, Rule 51, to allow defendant to assign this refusal to charge as error. After appellant submitted its requested charges, the court said:

"Of course, they are supposed to have been ruled on and the parties are supposed to have taken exceptions before the arguments began, but the record may show that you have exceptions, the Plaintiff has exceptions to the given charges, and the Defendant has exceptions to the refused charges, separately and severally, and you can assign those objections at the appropriate time. That will save having to take time out now for that."

We do not think the error was waived by the failure to except to the court's oral charge later; the appellant having submitted written requests and received assurance that it would have its objection to the refused instructions, it would be unwarranted to infer that this was intentionally abandoned. Since Rule 51 was literally complied with, it is unnecessary to decide whether it should be read together with Rule 46 in order to mitigate its rigor, as some Circuits have held. See Fuller v. King, 6 Cir., 204 F. 2d 586, 591.

12. Alabama Power Co. v. Dunlap, 240 Ala. 568, 200 So. 617; Gadsden Gen. Hosp. v. Hamilton, 212 Ala. 531, 103 So. 553, 40 A.L.R. 294; First Nat. Bank v. Stewart, 204 Ala. 199, 85 So. 529, 13 A.L.R. 302.

But see Hicks Bros. v. Swift Creek Mill Co., 133 Ala. 411, 31 So. 947, 57 L.R.A. 720, 91 Am.St.Rep. 38, which intimates that punitive damages can be assessed where there is no ill will, but only malice in the technical sense of the intentional doing of a wrongful act without justification. The more authoritative pronouncements indicate that actual ill will rather than malice in the technical sense is truly a prerequisite. In the fairly recent case of Alabama Power Co. v. Dunlap, supra, the court said, 200 So. at page 621:

"In Birmingham Water [Works] Company v. Wilson, 2 Ala.App. 581, 56 So. 760, a suit for wrongful discontinuance of plaintiff's water supply, the language of Mr. Chief Justice Stone was quoted with approval from Wilkinson v. Searcy, 76 Ala. 176, as follows: '* * * that to authorize punitive, exemplary, or vindictive damages (different names for the same thing), there must be "gross negligence within the strictest signification of the phrase, which must be construed to mean such entire want of care as to raise a presumption that the person in fault is conscious of the probable consequences of his carelessness, and is indifferent, or worse, to the danger of injury to the persons or property of others;" or that the act complained of "was done willfully (in its strong sense), or was the result of that reckless indifference to the rights of others, which is equivalent to an intentional violation of them;" or "where the injury

quences to others.[13] The jury may infer this from circumstances of aggravation surrounding the tortious conduct.[14] The jury's assessment of punitive damages should be made with a view to punish the defendant and to warn and deter others from similar oppressive conduct.[15] In Alabama the jury may in its discretion assess punitive damages against a corporate defendant for oppressive acts of its agent done in the course of his employment, regardless of actual authority or ratification.[16]

As for the instructions given, they correctly stated that the purpose of punitive damages is to punish, but they failed to say *what* they are to punish; they may well have misled the jury to think that any tort is so punishable. They correctly say that the jury may award punitive damages not arbitrarily, but in their sound discretion; but they fail to state any guide to their discretion in determining the *assessability* of such damages. The reference to certain factors as guides to the *amount* of such damages is not at all the same thing. The last paragraph quoted from the charge certainly does not state a test. The purpose of this paragraph is not quite clear. It states a definition of "maliciously" which (although as we have said, the word has two distinct meanings) has received some approbation in Birmingham Broadcasting Co. v. Bell, 259 Ala. 656, 68 So.2d 314. But this definition, though serving no clear purpose since it is not even tied into the preceding paragraph, might well have left an impression on the jury and they could impose punitive damages for *any* wrongful act. The court said noth-

ing to dispel this possible erroneous impression. It did not even say, for instance, that to recover punitive damages malice must be shown.

Therefore, although we think the evidence was clearly sufficient to authorize the imposition of punitive damages by a jury on all counts under proper instructions, the verdict cannot stand because the instructions were so deficient in this important area of the case. We cannot say that the error was harmless, for it is established law that the court may not instruct the jury that punitive damages must be given no matter how aggravated the tort. First Nat. Bank v. Stewart, 204 Ala. 199, 85 So. 529, 13 A.L.R. 302; Restatement, Torts § 908, Comment *d.* To permit the jury to proceed on the assumption that they could assess punitive damages, particularly on the conversion count, without finding aggravating circumstances in spite of defendants' requested instruction on the point, was clearly prejudicial. The fact that the actual proven compensatory damages were small and the total figure of damages must therefore have been largely accounted for by a very substantial, if not too substantial, amount of punitive damages, demonstrates the danger of prejudice resulting from this error.

As for appellants' contentions that no substantial damages were proved under counts 1 and 4, and that this issue should have been kept from the jury by the requested instructions, we find no merit in them. Binzel did prove at least the loss of interest on the checks

has been wanton, or malicious, or gross;" or "where fraud, malice, or oppression appears;" or, we may add, where the taking is accompanied with violence, or insulting or contemptuous language or demeanor. * * *'"

13. Mobile, Jackson & K. C. R. Co. v. Smith, 153 Ala. 127, 45 So. 57, 127 Am. St.Rep. 22; Alabama G. S. R. Co. v. Hill, 93 Ala. 514, 9 So. 722, 30 Am.St.Rep. 65; Richmond & D. R. Co. v. Vance, 93 Ala. 144, 9 So. 574, 30 Am.St.Rep. 41.

14. Clinton Mining Co. v. Bradford, 200 Ala. 308, 76 So. 74; Sparks v. McCreary,

156 Ala. 382, 47 So. 332, 22 L.R.A.,N.S., 1224; Donnell v. Jones, 13 Ala. 490, 48 Am.Dec. 59.

15. Comer v. Age-Herald Pub. Co., 151 Ala. 613, 44 So. 673, 13 L.R.A.,N.S., 525.

16. Alabama G. S. R. Co. v. Frazier, 93 Ala. 45, 9 So. 303, 30 Am.St.Rep. 28; Alabama G. S. R. Co. v. Sellers, 93 Ala. 9, 9 So. 375, 30 Am.St.Rep. 17; Mobile & O. R. Co. v. Seales, 100 Ala. 368, 13 So. 917. See also Sovereign Camp, W. O. W. v. Roland, 232 Ala. 541, 168 So. 576.

delayed in the mails, amounting to ten to twenty dollars, very substantial annoyance and inconvenience in having to have his mail delayed and photostated, and invasion of his privacy. This was certainly sufficient without more to support an award of compensatory damages on these counts. Appellants objected to, and the court properly excluded, evidence of diminished profits of Binzel's business, because it was too remote and speculative, since he had changed to another line of cleaning compounds. This is obviously a difficulty present in proving damages for any such disruption of business. The law does not require an impossible precision in the proof of such damages. We think the proper principle is stated in Restatement, Torts § 912, Comment *d*:

"Where there is an interference with intangible rights, such as in interference with a business, there may be great difficulty in proving the existence or amount of loss with any degree of certainty. * * * Although in such cases, the burden is on the injured person to prove with a fair degree of certainty that the business or transaction was or would have been profitable, it is not fatal to the recovery of substantial damages that he is unable to prove with definiteness the amount of the profits he would have made or the amount of harm which the defendant has caused. It is only essential that he present such evidence as might reasonably be expected to be available under the circumstances."

See Sparks v. McCreary, 156 Ala. 382, 47 So. 332, 22 L.R.A.,N.S., 1224; Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544; Shell Oil Co. v. State Tire & Oil Co., 6 Cir., 126 F.2d 971. We think the proof was sufficient to support substantial compensatory damages on counts 1 and 4.

In Alabama the jury may award punitive damages for such an aggravated tort even though the plaintiff has failed to show any actual damages, and though the jury finds him entitled only to nominal compensatory damages.[17] And while it is said that the amount of punitive damages ought "to bear proportion to the actual damages suffered," [18] it is not necessary that there be any definite mathematical relationship,[19] and the actual damage is only one factor to be considered by the jury with all the other attendant circumstances in exercising its sound discretion. That exercise of discretion will not be disturbed by a court if, "allowing all presumptions in favor of" it, the court is not "clearly convinced it is so excessive as to demand the interposition of this court." [20]

The final specification of error, that a new trial should have been granted for excessiveness of the verdict or because the verdict was against the weight of the evidence, need not be dealt with in view of the fact that this case is to be retried on the issue of damages. Also, appellants present for the first time on this appeal the argument that punitive damages should not be assessed on count 4 because after institution of this action it is apparent that they acted in reliance upon advice of counsel. We may not consider this question, now specifically raised for the first time. In this connection see Scalise v. National Utility Service, 5 Cir., 120 F.2d 938.

We have discussed the issues raised on this appeal at considerable length, because it is necessary to provide guidance to the trial court for purposes of a new trial. There being prejudicial error in the failure to instruct as to the test of assessing punitive damages, the judgment must be set aside.

The judgment is therefore reversed and the case remanded for a new trial.

17. Alabama G. S. R. Co. v. Sellers, 93 Ala. 9, 9 So. 375, 30 Am.St.Rep. 17.

18. Mobile & M. R. Co. v. Ashcraft, 48 Ala. 15, 33.

19. Bell v. Preferred Life Assurance Soc., 320 U.S. 238, 64 S.Ct. 5, 88 L.Ed. 15, reversing, 5 Cir., 131 F.2d 516 (applying Alabama law).

20. Alabama Water Service Co. v. Harris, 221 Ala. 516, 129 So. 5, 8.

CAMERON, Circuit Judge.

I concur specially.

CAMERON, Circuit Judge (specially concurring).

I concur in the reversal, but I do not think the opinion goes far enough. I feel that this whole controversy grows out of a legitimate business dispute which could be disposed of by a little give and take. Moreover, I do not find any basis for punitive damages, and what actual damages Plaintiff sought to prove were largely self-inflicted or self-augmented.

Lemmon, Circuit Judge, dissented on rehearing.