ABC–PARAMOUNT RECORDS, INC.,
Appellant,

v.

TOPPS RECORD DISTRIBUTING CO.,
Inc., Gwynn M. "Babe" Elias, Individu-
ally and as President of Topps Record
Distributing Co., Inc. and Ray W. Cur-
ran, Jr., Appellees.

TOPPS RECORD DISTRIBUTING CO.,
Inc., Gwynn M. "Babe" Elias, Individu-
ally and as President of Topps Record
Distributing Co., Inc. and Ray W. Cur-
ran, Jr., Appellants,

v.

ABC–PARAMOUNT RECORDS, INC.,
Appellee.

No. 23038.

United States Court of Appeals
Fifth Circuit.

March 22, 1967.

Rehearing Denied April 27, 1967.

Dwight Sullivan, Scott, McCarthy, Steel, Hector & Davis, Miami, Fla., for appellant-appellee.

George Elias, Jr., Miami, Fla., for appellees-appellants.

Before JONES, WISDOM and GOLDBERG, Circuit Judges.

GOLDBERG, Circuit Judge:

This case comes from the raucous, fast-moving, competitive world of American popular music, where nothing is more alive than the hope of success, nothing commoner than failure, nothing more ephemeral than fame, and nothing more fundamental than a smile and a shoeshine.[1]

Ray Curran, one of the plaintiffs and a fledgling enterpriser in entertainment, was the manager of a country club in Jacksonville, Florida. Curran's first ven-

---

1. "You don't understand; Willy was a salesman. And for a salesman, there is no rock bottom to the life. He don't put a bolt to a nut, he don't tell you the law or give you medicine. He's a man way out there in the blue, riding on a smile and a shoeshine." Miller, Death of a Salesman, at 138 (1949).

ture as a promoter was a large show in the Jacksonville Coliseum, scheduled for an evening in January or February of 1963. The plane carrying the entertainers was delayed, owing to fog, and Curran had eight or ten thousand people in his audience with no performers. Suddenly a small young man, unknown to Curran, appeared and asked if he could perform until the regulars arrived. Curran paused only to ask if the stranger had a union card, and on an affirmative answer he allowed the youngster to perform. After the show the youngster was paid and disappeared. Curran forgot him, but a few weeks later he walked into Curran's country club office, told Curran he wanted to make a recording, and convinced Curran to be a partner in the enterprise. The young man's name was James Tennant, but his stage name was Jimmy Velvit.

Velvit and Curran agreed that each would put up half the money for the recording session, but Velvit later told Curran that he could not afford to put up anything. So Curran paid the total cost, about $2,000.00, of making the recordings in Nashville.[2] Velvit put up the talent, and they agreed that each owned half of the enterprise.

The session took place in Nashville on April 9, 1963, and Velvit recorded four songs on tape: "We Belong Together", "I'm Gonna Try", "History of Love", and "Mr. Lonely." The first two of these songs were pressed on 1,000 records, using the "Velvet" label (this label was used to give the word "velvet" as much exposure as possible).

These recordings on the Velvet label were not an end in themselves. Velvit

and Curran wanted to sell the performances to a large recording company, which would sell the record nationally, pay a royalty to the owners, and make a reputation for Velvit.

Velvit and Curran were both neophytes, and both knew that they needed an experienced promoter to distribute the record and get it played on the air. Only success here would lead a large record company to purchase the record.[3] Velvit therefore approached Gwynn M. (Babe) Elias, another plaintiff. Elias was at that time president of the Topps Record Company (another plaintiff), a record distributor. Elias's duties were "to get air play throughout Florida for new record releases, escort and introduce the artists, arranging interviews for them with the disc jockeys (DJs), columnists, accounts, set up displays in retail outlets, etc. His success depended on making and keeping excellent relations with all DJs, columnists and accounts, who controlled the extent of exposure a record would receive." He appeared to be just the man for the job, and he contracted in late April with Curran to attempt to sell the recording to a large company, in return for a half interest in the proceeds.

Elias then embarked upon an intensive campaign, including trips around Florida, phone calls, mailings, a trip to New York to arrange for national distribution, and other "promotional gimmicks and bonuses."

When Elias started to negotiate with several large companies who seemed interested, he found it hard to stay in contact with Curran, who was not knowledgeable in such matters. For these rea-

---

**2.** This sum included expenditures for arrangements, accompaniment, making the masters, pressing individual records, printing labels, transportation, and miscellaneous personal expenses. Nashville is the center of popular music in the southeast United States. As Velvit testified, "Like in Nashville everybody is in music. If you are not in music, you're not even in Nashville."

**3.** This promotion involves promotional gimmicks, peculiar to the trade, and consists

almost entirely of convincing the disc jockeys who play the records on the air, and other people of influence, to play the record in as many places and as often as possible. If anything is clear in this litigation, it is that the success of this promotion owes at least as much, and probably substantially more, to the skill and persuasive powers of the promoter as it does to the merit of the particular performance.

sons Curran, on July 8, gave Elias full authority to make a deal on his own.

Finally, on August 14, Elias sold the record to Cortland Records, Inc., for distribution on Cortland's "Witch" label. While Cortland was not a large firm, it was young and pushing hard, and Elias testified that he thought it was willing to stake its new and hardfought reputation on the Velvit record, where a well-established but larger company might not. Since a great deal of the success or failure of a record depends upon the skill and persistence of its owners in promoting and selling it, this choice was extremely important.

Cortland paid Elias a $500 bonus,[4] promised to pay a royalty of 7½ cents per record to Elias, and promised to pay the copyright royalties of 1½ cents on "We Belong Together" and 2 cents on "I'm Gonna Try" to their respective owners (who are not a part of this litigation).

Cortland then immediately embarked upon intensive promotion of the Velvit record on the national market.

Apparently in ignorance of the deal which Elias had made with Cortland, Velvit, through an acquaintance, arranged to meet in Nashville with Felton Jarvis in late August in the offices of the defendant ABC–Paramount. Jarvis was in charge of ABC's artists and repertoire for the southeast United States.

Velvit testified that at the time he was dissatisfied because he thought the record had not been sold. He played all four songs which had been recorded in the April session in Nashville to Jarvis and to Gene Goodman, a member of a music publishing firm. Jarvis liked Velvit's recordings, and mentioned that ABC would be interested in buying the performances and in putting Velvit under contract.

Velvit then showed Jarvis and Goodman copies of his contract with Curran for the April recording session and Curran's contract with Elias for the promotion and sale of the record. Jarvis and Goodman read the contracts and declared them one-sided and not binding. Jarvis advised Velvit to "forget" Curran and his contract, and said that only Curran, and not Velvit, was bound to Elias, and therefore there was nothing to worry about from either Elias or Curran.

Velvit was then taken to New York by Goodman,[5] and there, on August 23, Velvit met Larry Newton, then vice-president of ABC, and signed a contract selling the performances to ABC.

After his return to Nashville, on about September 4, Velvit read in a trade magazine that Elias had sold the performances to Cortland's Witch label. Very worried, Velvit went to see Jarvis at ABC and showed him the article. Jarvis, also worried, said that Velvit had better get things straightened out.

Velvit then called Cortland Records, and spoke to Earl Glicken and William Erman, the owners. Velvit told them in strong language and at length, that Elias had stolen the performances and had no right to sell them, and that ABC had bought them and was going to issue a record.

Glicken and Erman were concerned. They had staked Cortland's reputation on Velvit's record, and they felt that ABC, a large and well-advised company, would not have bought the record unless Velvit had had the right to sell it.

Erman immediately called Elias to ask him to explain. Elias answered that he would have Velvit call Cortland and explain, and Elias tried to reach Velvit at ABC in Nashville, but Jarvis instructed Velvit not to answer the phone or speak to Elias, and ABC's employees answered Elias's calls by saying Velvit was out. Glicken and Erman were still able to reach Velvit on the phone, and to them Velvit repeated his statements that Elias had had no right to sell the record.

4. This $500 was paid to Elias by crediting Topps' account with Cortland. Topps had an account with Cortland because it was Cortland's Florida distributor.

5. Although not germane to this action, in return for expenses for the New York trip, Velvit assigned Goodman his interest in the publishing rights in the songs.

Cortland, confronted with its own conversations with Velvit, and Elias's inability to reach Velvit, became convinced that Elias was in the wrong. Cortland cancelled its contract with Elias, and stopped production, promotion, and sales of the record. It called all of its distributors and the disc jockeys with whom it had influence and told them that it had had no right to make the record. To save embarrassment Erman testified,

"I tried to shift the blame [to Elias]; * * * we were innocent bystanders * * * and Babe Elias had taken advantage of us. That's why I cancelled the contract with him."

ABC began its own promotion of the record, which ultimately sold 55,000 copies. ABC paid a total of $2,676.02 in royalties on the record to Velvit; and it earned a net profit of $2,451.92. The sale of 55,000 was not good for the record business at that time. Newton testified that a successful record in 1963 would have sold 700,000 or 800,000 copies.[6]

The plaintiffs, Curran, Elias and Topps (all Florida citizens) sued ABC–Paramount, a New York corporation, claiming damages for unfair competition, interference with contractual relations, and defamation. The case was tried to a jury. At the close of the evidence the trial judge ruled out all claims except that for interference with contractual relations.

The jury returned verdicts of $7,500 for Curran, and $15,000 for Topps. The trial court enjoined ABC from using the Velvit recordings and ordered their return to Topps.

ABC here appeals, contesting only the damages awarded. The plaintiffs cross-appeal, arguing that their claim of slander was wrongfully excluded, and that the trial judge should have charged the jury on the question of punitive damages.

We affirm in all respects, except that we hold that plaintiffs are entitled to a retrial on the issue of punitive damages only.

I.

ABC contends that the compensatory damages awarded by the jury were unwarranted by the evidence and merely speculative.

 Preliminarily we note that both parties argue the question of sufficiency of the evidence as if it were a question of Florida law. We disagree. It is true that

"cases following Erie [R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188] have evinced a broader policy to the effect that the federal courts should conform as near as may be—in the absence of other considerations—to state rules even of form and mode where the state rules may bear substantially on the question whether the litigation would come out one way in the federal court and another way in the state court if the federal court failed to apply a particular local rule. E. g., Guaranty Trust Co. [of New York] v. York, supra (326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079); Bernhardt v. Polygraphic Co. [of America, Inc.], 350 U.S. 198 [76 S.Ct. 273, 100 L.Ed. 199]. Concededly the nature of the tribunal which tries issues may be important in the enforcement of the parcel of rights making up a cause of action or defense, and bear significantly upon achievement of uniform enforcement of the right. It may well be that in the instant personal-injury case the outcome would be substantially affected by whether the issue of immunity is decided by a judge or a jury. Therefore, were 'outcome' the only consideration, a strong case might appear for saying that the federal court should follow the state practice.

"But there are affirmative countervailing considerations at work here.

---

6. He testified that at time of trial (February, 1965) the success of English rock and roll groups, primarily the Beatles, had so injured the market for American records that when an American record sold 350,000 or 400,000 records it was considered a success.

The federal system is an independent system for administering justice to litigants who properly invoke its jurisdiction. An essential characteristic of that system is the manner in which, in civil common-law actions, it distributes trial functions between judge and jury and, under the influence—if not the command—of the Seventh Amendment, assigns the decisions of disputed questions of fact to the jury. Jacob v. [City of] New York, 315 U.S. 752 [62 S.Ct. 854, 86 L.Ed. 1166]. The policy of uniform enforcement of state-created rights and obligations, see, e. g., Guaranty Trust Co. [of New York] v. York (US), supra, cannot in every case exact compliance with a state rule—not bound up with rights and obligations—which disrupts the federal system of allocating functions between judge and jury. Herron v. Southern Pacific Co., 283 U.S. 91 [51 S.Ct. 383, 75 L.Ed. 857]. Thus the inquiry here is whether the federal policy favoring jury decisions of disputed fact questions should yield to the state rule in the interest of furthering the objective that the litigation should not come out one way in the federal court and another way in the state court." 78 S.Ct. at 900–901, 2 L.Ed.2d at 962–963.

Byrd v. Blue Ridge Rural Electric Cooperative, 1958, 356 U.S. 525, 536–538, 78 S.Ct. 893, 900–901, 2 L.Ed.2d 953, 962–963, reh. den. 357 U.S. 933, 78 S.Ct. 1366, 2 L.Ed.2d 1375 (1958).

■ In *Byrd,* the Supreme Court held that *Erie* did not prevent the issue of whether Byrd was covered by workmen's compensation, which would be tried to a judge in a state trial, from being tried to a jury in a federal diversity case. The Court continued:

"It cannot be gainsaid that there is a strong federal policy against allowing state rules to disrupt the judge-jury relationship in the federal courts."

356 U.S. at 538, 78 S.Ct. at 901, 2 L.Ed.2d at 963.

■■ In the present case, the federal courts' judge-jury relationship would suffer a similar disruption if the trial judge had to apply the Florida rather than the federal standard of sufficiency of evidence in determining whether to take away from the jury certain fact issues concerning damages. This Court has held repeatedly that " * * * in a diversity case, state law controls as to the substantive elements of plaintiff's case and of defendant's defense, but the sufficiency of the evidence to raise a question of fact for the jury is controlled by federal law." Shirey v. Louisville & Nashville R. Co., 5 Cir. 1964, 327 F.2d 549, 552; Melton v. Greyhound Corp., 5 Cir., 1965, 354 F.2d 970; Kirby Lumber Corp. v. White, 5 Cir. 1961, 288 F.2d 566; Revlon, Inc. v. Buchanan, 5 Cir. 1959, 271 F.2d 795, 81 A.L.R.2d 222; Reuter v. Eastern Air Lines, 5 Cir. 1955, 226 F.2d 443.

■ We proceed to ABC's claim that the damages found were speculative. ABC asserts that the plaintiffs did not show how many of the Cortland records would be sold, and argues that damages should therefore be limited to the combined out-of-pocket expenses of Curran, Elias, and Topps, plus the $500 credit which Cortland retracted from the Topps account.

ABC admits liability. It admits that it knew Velvit was bound to Curran and Elias when it induced Velvit to ignore that contract and sign its own. ABC is the tortfeasor; its own act prevented anyone from determining how many copies of the record Cortland could have sold. Now ABC tries to use the uncertainty which it caused as a shield to any more than a pinprick of liability.

A successful attempt of this sort would be unjust and unbearable for our system. Such a result " * * * would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain. [This result] * * * would mean that the

more grievous the wrong done, the less likelihood there would be of a recovery." Bigelow v. RKO Radio Pictures, Inc., 1946, 327 U.S. 251, 264–265, 66 S.Ct. 574, 579–580, 90 L.Ed. 652, 660.

For these reasons, the rule which demands proof of damages (see Restatement, Torts, § 912 (1939)), is relaxed somewhat in cases where exact loss is unascertainable because of the tort.

"Although in such cases, the burden is on the injured person to prove with a fair degree of certainty that the business or transaction was or could have been profitable, it is not fatal to the recovery of substantial damages that he is unable to prove with definiteness the amount of profits he would have made or the amount of harm which the defendant has caused. *It is only essential that he present such evidence as might reasonably be expected to be available under the circumstances * * *.*" Restatement, Torts § 912, Comment d (1939) [emphasis added].

The Supreme Court, in Bigelow, supra, 327 U.S. at 264, 66 S.Ct. at 580, 90 L.Ed. at 660, recognized this rule.

"But the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. In such circumstances 'juries are allowed to act on probable and inferential as well as [upon] direct and positive proof.' [citing Story Parchment Co. v. Paterson Parchment Paper Co., supra, 282 U.S. 555 at 564, 51 S.Ct. 248 at 250, 251, 75 L.Ed. 544 at 549, and Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684]."

We have followed that result in Robey v. Sun Record Co., 5 Cir. 1957, 242 F.2d 684. See Hartley & Parker, Inc. v. Florida Beverage Corp., 5 Cir. 1962, 307 F.2d 916; Kelite Products v. Binzel, 5 Cir. 1955, 224 F.2d 131.

The "relevant data" in evidence in the present case included the contract setting royalty payments to Topps and the Curran-Elias agreement. There was evidence (from ABC's vice president, Newton) of the expected sales of a successful record at that time and evidence that the right to reissue a successful record as part of an album was worth up to $10,000.[7] Cortland was represented as a young and eager company with several hits to its credit. Evidence which the jury could believe showed that skill and persistence in promotion, distribution and sale of a record can make the difference between success and failure. Indeed, in Robey v. Sun Record Co., supra, a case in which the defendant enticed a popular singer away from a contract with plaintiff, we said

"In determining the amount of damages for the interference with a contract for the personal services of a musical artist, and we will not deny those who had and those who sought the right to his services the privilege of regarding him as such, there is not any fixed yardstick by which the award of damages is to be measured. There was a heavy sale of the first record made by Parker for Sun. The sales of the second record started well but declined rapidly. This is urged by Robey as showing that Parker's career was coming to a close and the interference by Robey, if any there was, did not

7. The testimony as to possible future reissue value was given by Elias.

The masters and tapes of the performances were returned to plaintiffs by order of the trial court. As part of its argument on appeal, ABC claims that this return is an election of remedies which precludes plaintiffs from recovering for lost future value. But if the plaintiffs are to be placed in the position in which they would be if there had been no breach, they must be given the tapes and masters

*plus the value lost because ABC interfered and promoted the record itself.* Without such lost value, part of which we may assume is profits from future reissue, the return of the tapes and masters is the return of the bottle without the milk. The performances may be returned, but the ability to exploit them is gone. This suit is not over who owns the performances; it is over what exploitation of them could have been worth.

result in damages. But, as Sun contends, it may be that the heavy sale of the first record might have been attributable to the skillful guidance of Sun as much as to the talents of Parker." 242 F.2d at 689.

We hold that the evidence was sufficient to support the jury's verdict.

II.

On the cross-appeal, plaintiffs claim that the trial judge erroneously took the issues of punitive damages and slander from the jury.

 Under Florida law, punitive damages may be asserted for "malice, moral turpitude, wantonness, or the outrageousness of the tort." Dr. P. Phillips & Sons, Inc. v. Kilgore, 152 Fla. 578, 12 So.2d 465; Winn & Lovett Grocery Co. v. Archer, 1936, 126 Fla. 308, 171 So. 214. The Florida cases also make it clear that "malice" does not necessarily mean "anger or a malevolent or vindictive feeling toward the plaintiff" (Farish v. Smoot, 1952, Fla., 58 So.2d 534, 538), but can be inferred from "entire want of care or attention to duty, or great indifference to the persons, prop-erty or rights of others." Griffith v. Shamrock Village, 1957, Fla., 94 So.2d 854. See also LaPorte v. Associated Independents, Inc., 1964, Fla., 163 So.2d 267; Webb's City, Inc. v. Hancur, Fla. App.1962, 144 So.2d 319. The facts of Griffith show that this rule means what it says: the plaintiff, who lived in the defendant's apartment house, recovered compensatory and punitive damages for the defendant's wanton failure to deliver a telephone message from plaintiff's family advising plaintiff of his brother's wedding date. The plaintiff did not prove actual malice between the defendant and himself, but rested on the gross want of care showed by defendant in failing to carry out a duty which it had assumed. The Florida Supreme Court upheld a jury verdict including punitive damages.

 In the present case, the trial judge followed the commendable practice of holding a detailed charge conference, portions of which are in the printed record on appeal. During this conference the judge indicated that he would not charge on punitive damages because the evidence did not warrant a finding of "malice" or "reckless disregard" of plaintiffs' contract rights.[8] Scrutiny of the

---

8. "MR. ELIAS:

Your Honor, I think the testimony would point out, * * * that the question of reckless disregard for the rights of others—
THE COURT:

I don't recall anything like that. Your only witness said they kept it concealed from them. I don't think there was any reckless disregard. I think there was an unlawful interference.
MR. ELIAS:

Twice. On the first time, the testimony is that—
THE COURT:

Whose testimony?
MR. ELIAS:

Mr. Jarvis's and Jimmy Velvit's. Both testified that they at least saw the first management contract. They knew there was some agreement.
\* \* \* \* \*
In any event, on September 7th or the first week of September, Mr. Jarvis ad-mitted that he knew about the Cortland record coming out.
THE COURT:

Oh, yes.
MR. ELIAS:

And he said he sent the boy—
THE COURT:

That doesn't mean that he knew Cortland was right and he was wrong.
\* \* \* \* \*
I am not going to give maliciousness, because there is no testimony to the contrary of anything.

The testimony is that Jimmy * * * thought he had equal rights with this gentleman to sell that record, and he went around and sold it. He didn't tell all the facts because he said he didn't want to get in trouble. He wanted to get money.
MR. ELIAS:

But he also testified that he went in there and he told them the whole story. He said Babe [Elias] had been promoting the record and they said, 'Forget him * * *.' "

record in light of the Florida cases forces us to disagree. Reasonable minds might differ over ABC's motive and attitude in advising Velvit to drop his association with Curran and Elias. Velvit testified that Jarvis told him repeatedly to "forget" Curran and Elias. He also testified that rather stronger language was used to give this advice. ABC might have believed that Velvit's contract with Curran was not binding, but we do not think that the evidence excludes the possibility that ABC wanted Velvit for itself and felt that it could get away with inducing Velvit to break an otherwise binding agreement, in complete disregard of the rights of Curran, Elias, and Topps. This issue should have been left to the jury. E. g., Geddes v. Daughters of Charity of St. Vincent De Paul, Inc., 5 Cir. 1965, 348 F.2d 144.

III.

We agree with the trial judge, however, that plaintiffs made out no cause of action for defamation.

The plaintiffs' brief on this point refers to two instances to support its claim that the slander issue should not have been taken from the jury. The first is Velvit's characterization of Elias. in the telephone conversation with Erman and Glicken from the ABC office. The second is the characterization of Elias which Erman and Glicken made to the industry generally when they embarrassedly withdrew the Velvit record. The fatal deficiency in these claims is immediately obvious: ABC did not make these statements, and in fact nowhere in the transcript does any witness say that ABC said or wrote anything defamatory about any of the plaintiffs. Whatever else ABC may have done, it kept its mouth shut doing it.

There must be a retrial limited to the issue of punitive damages, but in all other respects the judgment is affirmed.

Affirmed in part; reversed and remanded in part.